JEFFREY MEEK ET AL. *v.* WAL-MART
STORES, INC., ET AL.
(AC 21397)

Lavery, C. J., and Schaller and West, Js.

Argued May 6—officially released September 24, 2002

*Richard F. Wareing*, with whom, on the brief, was *Thomas J. Rechen*, for the appellants (defendants).

*Michael J. Walsh*, for the appellee (named plaintiff).

*Opinion*

LAVERY, C. J. The defendants, Wal-Mart Stores, Inc. (Wal-Mart), and Scott Adams and Herbert Hathaway, the manager and assistant manager, respectively, of the Wal-Mart store in Waterford, appeal from the judgment of the trial court, rendered following a jury trial, awarding damages to the plaintiff Jeffrey Meek[1] for personal injuries he sustained when he was struck by falling merchandise in a large self-service retail store, which injuries the jury determined were caused by the defendants' negligence. The defendants claim that (1) the court improperly denied their motions to set aside the jury's verdict and for a new trial because the evidence

---

[1] The plaintiffs are Jeffrey Meek and his wife, Cynthia Meek. The jury found in favor of the defendants as to Cynthia Meek's claims of loss of consortium, and she has not appealed. We therefore refer in this opinion to Jeffrey Meek as the plaintiff.

was insufficient to establish their negligence, (2) the court improperly instructed the jury on negligence, (3) the court abused its discretion in granting the plaintiff's motions for an additur and to set aside the jury's finding of comparative negligence, (4) the jury verdict was an impermissible compromise and (5) a new trial is required because the court improperly excluded evidence of the plaintiff's gambling activities. We disagree with each of those claims and affirm the judgment of the trial court.

The following facts, which the jury reasonably could have found, and procedural history are relevant to the defendants' appeal. On February 27, 1997, at about 6 p.m., the plaintiff and his wife, Cynthia Meek, were shopping in the sporting goods section of the Wal-Mart store in Waterford when the plaintiff was injured by falling merchandise. The couple was looking for a folding chair for Cynthia Meek, who was several months pregnant. The chairs were located on a lower level of the shelving. After Cynthia Meek tried a chair and found it unsatisfactory, the plaintiff bent over to return it to the shelf. While he was bending over, two aluminum folding camp tables in boxes fell suddenly from a higher shelf onto his back and neck, knocking him to the floor. Neither the plaintiff nor Cynthia Meek had noticed the tables before they fell, and no one else was in the aisle when the incident occurred.

Leslie Main, a Wal-Mart employee on duty in the sporting goods department, heard the tables fall and went to the aisle to investigate. When he arrived, the tables and a short metal restraining fence were on the floor. The plaintiff was rubbing his neck and acting as though he were in pain. Main was informed as to what had occurred, and thereafter returned the tables to the shelf and snapped the fence onto the shelf in front of the tables.

The tables that fell were in large rectangular boxes, and each weighed about seventeen pounds. The shelf on which they were stacked was approximately four and one-half to five feet from the ground, at about the plaintiff's shoulder level. Photographs introduced at trial depict the table display as the defendants typically maintained it as it had been reassembled by Main. Three boxed tables are on the shelf, one in back of the other. They are positioned standing up on end, almost vertically but leaning slightly back against the solid rear portion of the shelf. Together, the three boxes occupy the entire depth of the shelf. The bottom of the forward most box is resting against a short white fence that is attached to the front of the shelf. The fence appears to be about one tenth the height of the boxes. There are no other restraining devices securing the boxes to the shelf. The label of the forward most box, with a large picture depicting the table as assembled, is on the visible surface facing outward from the shelf.

The plaintiff sought medical help immediately following the incident. His condition worsened over time, and he sought further treatment and evaluation from a neurologist, a chiropractor and, eventually, a chronic pain specialist. As a result of being hit by the tables, the plaintiff suffered damage to the thoracic region of his spine that is chronic, painful and debilitating. He is unable to perform the intensive manual labor that was his employment prior to the incident. Because the plaintiff is not a high school graduate and cannot sit or stand for long periods of time, or lift anything heavy, his current employment prospects are extremely limited. His injury also has had strong repercussions on his ability to enjoy his personal and family life. At the time of the incident, the plaintiff was thirty-four years old.

On April 16, 1998, the plaintiff instituted a negligence action against the defendants. He claimed that his injuries were caused by the defendants in one or more of

the following ways: Wal-Mart or its employees placed the tables on the shelf in an unsafe manner; they failed to secure the tables to the shelf, although that reasonably could and should have been done; they failed to use a holding brace or bracket, although that reasonably could and should have been done; they failed to post signs warning customers of unsafe conditions; and they were not properly trained or supervised regarding safety matters, including securing items on shelves. As to Hathaway and Scott, the plaintiff alleged that they failed to use reasonable care in following Wal-Mart's safety policies concerning storage of merchandise; they failed to properly supervise other employees in storing merchandise safely and reasonably; they failed to properly inspect the shelving where the tables were stored; and they knew or should have known of numerous other incidents in which Wal-Mart customers were injured by falling merchandise that had been improperly stored, but failed to use reasonable care to prevent merchandise from falling on the plaintiff. In their special defenses, the defendants alleged comparative negligence, claiming that the plaintiff failed to be watchful of his surroundings and to use reasonable care for his safety commensurate with the conditions in the store.

The jury returned a verdict in favor of the plaintiff and against all the defendants and awarded $182,827 total damages.[2] The jury also found that 50 percent of the negligence causing the injuries was attributable to the plaintiff, and the damages award was reduced correspondingly.[3] The court thereafter granted the plaintiff's motions for an additur and to set aside the reduction of the damages award, concluding that there was no evidence submitted at trial to support the jury's finding of contributory negligence. The court denied

---

[2] That figure represents $122,827 in economic damages and $60,000 in noneconomic damages.

[3] See General Statutes § 52-572h (b) and (f).

the defendants' motion to set aside the verdict as to their negligence or for a new trial, rejecting their claims that the evidence was insufficient to establish their negligence, that the court's instructions to the jury were legally incorrect and that the court wrongly excluded certain evidence. This appeal followed. Additional facts will be provided where pertinent.

## I

The defendants claim first that there was insufficient evidence to support the jury's finding that they were negligent. Consequently, they argue that the court improperly denied their motion to set aside the verdict or for a new trial. We disagree.

"[T]he proper appellate standard of review when considering the action of a trial court granting or denying a motion to set aside a verdict and motion for a new trial . . . [is] the abuse of discretion standard. . . . In determining whether there has been an abuse of discretion, every reasonable presumption should be given in favor of the correctness of the court's ruling. . . . Reversal is required only where an abuse of discretion is manifest or where injustice appears to have been done." (Citation omitted; internal quotation marks omitted.) *Davis* v. *Fracasso*, 59 Conn. App. 291, 295, 756 A.2d 325 (2000).

"We are disinclined to disturb jury verdicts, and we accord great deference to the vantage of the trial judge, who possesses a unique opportunity to evaluate the credibility of witnesses. . . . The concurrence of the judgments of the [trial] judge and the jury . . . is a powerful argument for upholding the verdict. . . . Furthermore, it is not the function of this court to sit as the seventh juror when we review the sufficiency of the evidence . . . rather, we must determine, *in the light most favorable to sustaining the verdict*, whether the totality of the evidence, including reasonable infer-

ences therefrom, supports the jury's verdict . . . . In making this determination, [t]he evidence must be given the most favorable construction in support of the verdict of which it is reasonably capable. . . . In other words, [i]f the jury could reasonably have reached its conclusion, the verdict must stand, even if this court disagrees with it." (Citations omitted; emphasis in original; internal quotation marks omitted.) *Gaudio* v. *Griffin Health Services Corp.*, 249 Conn. 523, 534, 733 A.2d 197 (1999).

The defendants argue that the court's refusal to set aside the jury's finding of negligence was improper because there was no evidence showing that the defendants, without any intervening act by a third party, caused the incident that injured the plaintiff. They claim that the evidence established only that they elected to place the tables on a higher shelf, rather than on a lower one or on the ground, to stand them upright rather than flat and to restrain them using the short fence rather than a restraining bar, and that there was no proof that those decisions created a hazardous condition that caused the tables to fall on the plaintiff. Furthermore, because the evidence was uncontroverted that the defendants' typical manner of displaying the tables was leaning slightly backward so that they would not tip forward into the aisle and because no evidence was presented regarding the positioning of the tables just prior to their falling or exactly how they were set in motion, the defendants argue that a third party's actions necessarily caused the tables to be moved to a vertical position in which they were vulnerable to toppling. The defendants claim that under those circumstances, the plaintiff was required to prove that they had notice of the tables' dangerous position for the defendants to be liable for injuries caused by the fall. We are not convinced because we conclude that the jury, considering all of the circumstances, reasonably could have con-

cluded that the defendants were negligent in choosing to stack the tables as they did.

Typically, "[f]or the plaintiff to recover for the breach of a duty owed to her as a business invitee, she ha[s] to allege and prove that the defendant had actual or constructive notice of the presence of the specific unsafe condition that caused her [injury]. . . . Either type of notice must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it. . . . *If the plaintiff, however, alleges an affirmative act of negligence, i.e., that the defendant's conduct created the unsafe condition, proof of notice is not necessary.*" (Citations omitted; emphasis added; internal quotation marks omitted.) *Fuller* v. *First National Supermarkets, Inc.*, 38 Conn. App. 299, 301, 661 A.2d 110 (1995); see also *Tuite* v. *Stop & Shop Cos.*, 45 Conn. App. 305, 308, 696 A.2d 363 (1997); *Holody* v. *First National Supermarkets, Inc.*, 18 Conn. App. 553, 556, 559 A.2d 723 (1989); compare *Kapilotis* v. *Shop Rite Supermarket, Inc.*, 14 Conn. App. 250, 540 A.2d 376 (1988); see generally *Wal-Mart Stores, Inc.* v. *Garza*, 27 S.W.3d 64, 67 (Tex. App. 2000) (distinguishing premises defect theory from negligent activity theory); *Canfield* v. *Albertsons, Inc.*, 841 P.2d 1224, 1226 (Utah App. 1992) (same), cert. denied, 853 P.2d 897 (1993). That is because when a defendant itself has created a hazardous condition, it safely may be inferred that it had knowledge thereof. *Wal-Mart Stores, Inc.* v. *Sholl*, 990 S.W.2d 412, 418 (Tex. App. 1999); see *Wal-Mart Stores, Inc.* v. *Blaylock*, 591 N.E.2d 624, 628 (Ind. App. 1992); *Canfield* v. *Albertsons, Inc.*, supra, 1226. In this case, therefore, if the plaintiff could prove that the defendants had stacked the tables negligently, he would not need to prove also that they had notice of the dangerous condition such stacking presented.

We note first that " '[h]igh stacking' of merchandise has become a trademark of retail superstores. . . . By creating stores that resemble mini-warehouses and stacking goods as high as 18 feet, they virtually eliminate warehouse costs and save millions of dollars." "Falling Merchandise is a New P.I. Niche," Lawyers Weekly U.S.A. (June 28, 1999). "In a self-service operation, an owner has for his pecuniary benefit required customers to perform the tasks previously carried out by employees." *Ciminski* v. *Finn Corp.*, 13 Wash. App. 815, 819, 537 P.2d 850, review denied, 86 Wash. 2d 1002 (1975). Accompanying the savings realized through modern self-service retailing methods, however, has been a proliferation of incidents of injuries resulting from falling merchandise.[4] See generally annot., 61 A.L.R.4th 27 (1988); see also *Scharrel* v. *Wal-Mart Stores, Inc.*, 949 P.2d 89, 95 (Colo. App. 1997) (affirming admission into evidence of report identifying 17,000 incidents of falling merchandise that resulted in injuries to customers at Wal-Mart stores); 1 N. Landau & E. Martin, Premises Liability Law and Practice (2002) § 4.04 [6] ("[M]erchandise-related injuries can arise from falling displays. . . . [T]his situation is most likely to occur in various types of self-service stores where the merchandise is intended to be handled directly by the customer."); 27 Proof of Facts 2d 189, Dangerous Retail Floor Displays (1981); J. Hyman & M. Homan, "Falling Merchandise," 37 Trial 44 (January, 2001).

---

[4] Injuries resulting from incidents of customers slipping and falling on spilled product in self-service environments also are widespread. See generally *Chiara* v. *Fry's Food Stores of Arizona, Inc.*, 152 Ariz. 398, 733 P.2d 283 (1987); *Safeway Stores, Inc.* v. *Smith*, 658 P.2d 255 (Colo. 1983); *McDonald* v. *Safeway Stores, Inc.*, 109 Idaho 305, 707 P.2d 416 (1985); *Barsz* v. *Max Shapiro, Inc.*, 600 N.E.2d 151 (Ind. App. 1992); *Brown* v. *Winn-Dixie Louisiana, Inc.*, 452 So. 2d 685 (La. 1984); *Sheil* v. *T.G. & Y Stores Co.*, 781 S.W.2d 778 (Mo. 1989); *Head* v. *National Super Markets, Inc.*, 902 S.W.2d 305 (Mo. App. 1995); *Bozza* v. *Vornado, Inc.*, 42 N.J. 355, 200 A.2d 777 (1964); *Corbin* v. *Safeway Stores, Inc.*, 648 S.W.2d 292 (Tex. 1983); *Canfield* v. *Albertsons, Inc.*, supra, 841 P.2d 1224; *Ciminski* v. *Finn Corp.*, supra, 13 Wash. App. 815.

Whether a storekeeper has displayed merchandise in an unsafe manner such that injury to customers is foreseeable is for the fact finder to determine and is to be answered by considering all of the surrounding circumstances. *Fleming* v. *Wal-Mart, Inc.*, 268 Ark. 559, 563–64, 595 S.W.2d 241 (1980); *Colonial Stores, Inc.* v. *Donovan*, 115 Ga. App. 330, 331–32, 154 S.E.2d 659 (1967); 62A Am. Jur. 2d 159, 163, Premises Liability §§ 595, 598 (1990). "The merchant must use reasonable care in placing goods on the store shelves. Merchandise must not be stacked or placed at such heights, widths, depths, or in such locations which would make it susceptible to falling." 1 N. Landau & E. Martin, supra, § 4.04 [6]; see also *Pullia* v. *Builders Square, Inc.*, 265 Ill. App. 3d 933, 937, 638 N.E.2d 688, appeal denied, 158 Ill. 2d 565, 645 N.E.2d 1368 (1994); *Dougherty* v. *Great Atlantic & Pacific Tea Co.*, 221 Pa. Super. 221, 223, 289 A.2d 747 (1972). The jury also may consider the method of stacking, the presence or absence of lateral support, and the stacked item's dimensions and center of gravity. *Wal-Mart Stores, Inc.* v. *Sholl*, supra, 990 S.W.2d 417; *Fleming* v. *Wal-Mart, Inc.*, supra, 565–66. "Storekeepers may have a special obligation in regard to the storing and stacking of large, cumbersome, or unstable items which are likely to fall and injure customers." 62A Am. Jur. 2d 161, supra, § 596.

Injuries also may result indirectly from a proprietor's defective or negligent display of merchandise that nonetheless are wholly to be expected from the store's mode of operation and may be taken into account by the fact finder when it considers whether the method of display was unsafe. Thus, "one of the factors to be considered in establishing and maintaining a display in a department store is that the merchandise is going to be inspected by the customers. A merchandise display constructed so that an inspection by a customer, in a foreseeable and reasonable manner, causes the merchandise to fall,

is a negligently constructed display." *Fleming* v. *Wal-Mart, Inc.*, supra, 268 Ark. 563–64. "A storekeeper who balances merchandise on display in a precarious manner (or allows another to so arrange a display) should anticipate that slight force, not sufficient ordinarily to suggest to the actor who does not know of the peril that injury will result, may be sufficient to cause injury, and the storekeeper is not relieved of the consequences of this negligence by an intervening act which he should have anticipated." *Colonial Stores, Inc.* v. *Donovan*, supra, 115 Ga. App. 331; see also *Scharrel* v. *Wal-Mart Stores, Inc.*, supra, 949 P.2d 94, citing 2 Restatement (Second), Torts § 442B (1965).[5]

The concept is no less applicable where it is the foreseeable action of another customer who rendered the display dangerous to the injured plaintiff. See *Zitzow* v. *Wal-Mart Stores, Inc.*, 1999 WL 993993, *2 (Minn. App. 1999) (foreseeable behavior of other customer in adjacent aisle causing plaintiff's injury by falling merchandise not superseding cause); *Wooley* v. *Great Atlantic & Pacific Tea Co.*, 180 F. Sup. 529, 531 (W.D. Pa.) (grocery store owner could anticipate customers would disarrange high can display to extent that slightest disturbance would cause some cans to fall), aff'd, 281 F.2d 78 (3d Cir. 1960). "The very reason for the need to exercise due care in stacking is that the initial *or subsequent* disarray may cause an item to fall." (Emphasis added.) *Dougherty* v. *Great Atlantic & Pacific Tea Co.*, supra, 221 Pa. Super. 223. "[W]here the storekeeper operates under a self-service system, he must take into account the possibility of shoppers disarranging the merchandise and possibly leaving it in a

---

[5] Section 442B the Restatement (Second) of Torts provides: "Where the negligent conduct of the actor creates or increases the risk of a particular harm and is a substantial factor in causing that harm, the fact that the harm is brought about through the intervention of another force does not relieve the actor of liability, except where the harm is intentionally caused by a third person and is not within the scope of the risk created by the actor's conduct."

dangerous condition; therefore, where a storekeeper has no basis for believing that customers will discover a dangerous condition or realize the risk involved, he is under a duty to exercise ordinary care either to make the condition reasonably safe for their use or to give a warning adequate to enable them to avoid the harm." 62A Am. Jur. 2d 160, supra, § 595.[6]

We realize that a negligent activity theory, as opposed to a premises defect theory, "usually requires that the storeowner, its agents, or employees actually create the condition or defect that results in an injury to a patron. However, there is no logical distinction between a situation in which the storeowner directly creates the condition or defect, and where the storeowner's method of operation creates a situation where it is reasonably foreseeable that the expectable acts of third parties will create a dangerous condition or defect. See *De Weese* v. *J.C. Penney Co.*, 5 Utah 2d 116, 121, 297 P.2d 898, 901 (1956) ('a negligent act may be one which "creates a situation which involves an unreasonable risk to another because of the expectable action of the other [*or*] *a third person*" ') (quoting [2 Restatement, Torts § 302 (b) (1934)])." (Emphasis added.) *Canfield* v. *Albertsons, Inc.*, supra, 841 P.2d 1226.

Nonetheless, it must be emphasized that "a store owner is not an insurer of its customers' safety. Cer-

---

[6] That notion frequently has been applied in cases involving slip and fall incidents in self-service establishments that were caused by the foreseeable behavior of other customers dropping or spilling merchandise on the floor. See generally *Chiara* v. *Fry's Food Stores of Arizona, Inc.*, 152 Ariz. 398, 733 P.2d 283 (1987); *Safeway Stores, Inc.* v. *Smith*, 658 P.2d 255 (Colo. 1983); *McDonald* v. *Safeway Stores, Inc.*, 109 Idaho 305, 707 P.2d 416 (1985); *Barsz* v. *Max Shapiro, Inc.*, 600 N.E.2d 151 (Ind. App. 1992); *Sheil* v. *T.G. & Y Stores Co.*, 781 S.W.2d 778 (Mo. 1989); *Head* v. *National Super Markets, Inc.*, 902 S.W.2d 305 (Mo. App. 1995); *Bozza* v. *Vornado, Inc.*, 42 N.J. 355, 200 A.2d 777 (1964); *Corbin* v. *Safeway Stores, Inc.*, 648 S.W.2d 292 (Tex. 1983); *Canfield* v. *Albertsons, Inc.*, supra, 841 P.2d 1224; *Ciminski* v. *Finn Corp.*, supra, 13 Wash. App. 815.

tainly, where a display is caused to fall, and a customer is injured by an independent act of negligence which the merchant cannot reasonably be expected to foresee or guard against, the merchant is not liable. However, ordinary and foreseeable activities of patrons, not amounting to independent acts of negligence, should not result in injury to fellow patrons or themselves; and a merchant is negligent if he has so arranged his merchandise that such activities can cause merchandise to fall resulting in injury." *Fleming* v. *Wal-Mart, Inc.*, supra, 268 Ark. 564.

Applying those principles, we conclude that the jury reasonably could have found that the defendants were negligent in stacking the tables standing up, almost vertically, with only a short fence to restrain them on the shelf. Given the tables' large dimensions and substantial weight, it was foreseeable that placing them on end on a high shelf, with their centers of gravity significantly above the top of a much shorter fence, could lead to a dangerous situation after minimal inspection or slight movement caused by a customer. Specifically, although the defendants stocked the tables leaning slightly back, they could have foreseen that a customer inspecting them would move them slightly forward or remove and return them to the shelf in a totally upright position. Further, there was ample evidence introduced at trial showing that although the defendants were fully aware that customers rearranged merchandise with predictable regularity, they chose to display the tables as they did because of concerns about sales.

Main testified that Wal-Mart tries to keep its shelves as full as possible. He was aware that customers bumped shelves as they reached for merchandise, that they might inadvertently pull merchandise down onto themselves when reaching for it, and that the danger posed by falling merchandise increased along with its size and weight. He testified that although a restraining

bar effectively could have secured the tables, he did not consider using one because it would restrict customers' access to the merchandise.

Adams, the manager of the Waterford store, testified that Wal-Mart tried to be the price leader for every market in which it participated. He testified that in a typical week, there were 24,000 to 34,000 customers in the store and that throughout the course of the day, customers remove merchandise from the shelves and then, sometimes, return it to the shelves. He stated that Wal-Mart was aware that customers bumped shelves and that they rearranged merchandise "all too often." Adams testified further that although it would have been feasible to use a restraining bar in the table display, "it wouldn't make it very customer friendly," and "it could pose problems for making it shopable." John Leyenberger, Wal-Mart's division agency risk control manager, testified that it would not have been appropriate to stack the tables flat in an aisle display because they were not "high volume items."

Hathaway, the assistant manager of the Waterford store, testified that he was aware that Wal-Mart customers would totally rearrange merchandise from the manner in which it originally was stacked, not leaving it in the same condition in which it had been found, and that a heavy or large item placed on a high shelf in an unstable manner posed a risk of danger to customers if that item were to fall. He testified that it would not have been feasible to display the tables laid flat in an aisle display because they would not sell. In Hathaway's words, "How many customers are going to buy a white, flat object sitting on the floor?"

The defendants presented much testimony that the tables were stacked in accordance with Wal-Mart's safety policies. Nonetheless, the defendants' liability to the plaintiff "depends on [their] knowledge of store

conditions posing risks to customers and the failure to act reasonably in response to those risks, not on the failure to comply with a company policy." *Corbin* v. *Safeway Stores, Inc.*, 648 S.W.2d 292, 297–98 (Tex. 1983). If reasonable store conduct includes the use of a restraining bar in front of a particular display, the defendants may be held liable for not using one, regardless of whether it was required by company policy. See id., 298.

The measures taken by large, self-service retail merchandising establishments to protect their invitees must be commensurate with the risks inherent in that method of store operation. *Canfield* v. *Albertsons, Inc.*, supra, 841 P.2d 1227; *Brown* v. *Winn-Dixie Louisiana, Inc.*, 452 So. 2d 685, 687 (La. 1984); *Ciminski* v. *Finn Corp.*, supra, 13 Wash. App. 821; *Bridgman* v. *Safeway Stores, Inc.*, 53 Cal. 2d 443, 448, 348 P.2d 696, 2 Cal. Rptr. 146 (1960). Any economic loss resulting from the avoidance of those risks, if it exists, "should be borne by such commercial enterprises as a cost of doing business." *Dougherty* v. *Great Atlantic & Pacific Tea Co.*, supra, 221 Pa. Super. 223.

For the aforementioned reasons, we conclude that the court did not abuse its discretion when it denied the defendants' motions to set aside the verdict and for a new trial.

## II

The defendants next claim that the court improperly instructed the jury on negligence. We do not agree.

"The standard of review for a challenge to the propriety of a jury instruction is well established. [J]ury instructions are to be read as a whole, and instructions claimed to be improper are read in the context of the entire charge. . . . A jury charge is to be considered from the standpoint of its effect on the jury in guiding

it to a correct verdict. . . . The test to determine if a jury charge is proper is whether it fairly presents the case to the jury in such a way that injustice is not done to either party under the established rules of law." (Internal quotation marks omitted.) *Pestey* v. *Cushman*, 259 Conn. 345, 351, 788 A.2d 496 (2002).

In this case, the defendants requested a charge on negligence that conveyed, inter alia, that if they actually had placed the tables on the shelves in a manner that caused them to fall, without any intervening action by a customer, then the plaintiff was not required to prove that the defendants had actual or constructive knowledge of the unsafe condition of the display; conversely, if the dangerous condition was created by a customer who had moved the tables from their original position, then the plaintiffs needed to prove that the tables had been that way for a sufficient length of time such that the defendants, if they had exercised due care, should have discovered and remedied the situation.[7] The court

[7] The entire charge on that point that the defendants requested is as follows: "If you find that a Wal-Mart employee actually created the defective condition that caused the tables to fall, without any intervening action by any third party, then you need not consider whether Wal-Mart had notice or knowledge of the unsafe condition plaintiff complains of. On the other hand, if you find that [the plaintiff has] not proven by a preponderance of the evidence that a Wal-Mart employee actually caused the condition, or if you find the dangerous condition was created by a third-party such as a customer, then in considering whether Wal-Mart used due care in the present case, you must consider whether Wal-Mart had actual or constructive knowledge of the defect alleged. '[N]otice, whether actual or constructive, must be notice of the very defect which occasioned the injury and not merely of conditions naturally productive of that defect even though subsequently in fact producing it.' In determining whether Wal-Mart had actual notice, you will ask whether Wal-Mart actually knew of the dangerous condition presented by the camp tables that fell. If you decide that Wal-Mart did not have actual knowledge, you will then ask whether Wal-Mart had constructive notice. The controlling question in deciding whether Wal-Mart had constructive notice of the defective condition is whether the condition had existed for such a length of time that Wal-Mart's employees should, in the exercise of due care, have discovered it in time to have remedied it. In other words, even if you find that the merchandise that fell was a dangerous condition as [the plaintiff alleges] in [his] complaint, if you further find that [the]

declined to instruct as the defendants requested and, instead, gave what it termed a "modified notice charge" conveying, inter alia, that the jury should find the defendants negligent if it found that the manner in which they had stacked the tables was unreasonable in light of all of the surrounding circumstances, including the foreseeability that other customers would handle and rearrange merchandise. The court charged further that although the defendants, to be found negligent, must have had general knowledge that the display was dangerous under the circumstances, they need not have had "knowledge of the actual condition of the display here immediately before and at the time of this accident."[8]

---

plaintiff has not proven that this condition existed for a sufficient length of time to charge Wal-Mart with notice of it, you must find in favor of Wal-Mart."

[8] The relevant portion of the court's charge was as follows: "[T]he defendant owed to any invitee who entered its store a duty to use reasonable care to maintain [the] premises in a reasonably safe condition for the use of the plaintiff and other invitees or customers who entered its store to shop. That does not mean that the defendant was an insurer of the safety of the plaintiff or of anyone else who entered its store to do business; but the defendant had the duty to use reasonable care, and that means the care which a reasonably prudent person can possess or control on the property and the location where the accident occurred would have used under all the circumstances.

\* \* \*

"[W]hat are the circumstances which the defendant knew or should have known about . . . prior to or at the time of this accident regarding the folding tables and how they were displayed? You have heard testimony from Mr. Main as to how these items were stacked by Wal-Mart employees. As a standard practice, this is leaning back against the back support. They were approximately forty-five to sixty inches off the ground, according to the testimony. And placed in front of them was a piece of fencing, which was introduced into evidence. The table weighed about seventeen pounds.

"On the other hand, you have also heard testimony from Wal-Mart employees that it was known to them that customers would come to the displays of merchandise such as this one and move items, leaving them in a different position than the positions they were placed in originally by Wal-Mart employees. This knowledge of customer behavior ought to be considered by you in determining whether the defendant company acted with reasonable care. But keep in mind, the customer behavior must be that type of behavior

In this case, the plaintiff's claims were based on a theory of negligent activity, namely, that the defendants had displayed the tables dangerously. He did not advance a theory of negligence on the basis of a premises defect. Because the defendants' requested instruction focused mainly on the law of premises defects and emphasized the associated requirement of actual or constructive knowledge, the court properly refused to give that charge. See *Tuite* v. *Stop & Shop Cos.*, supra, 45

that was reasonably foreseeable based on prior experience as a company.

"Now, keep in mind the general definition of negligence and the duty to use reasonable care. What specific allegations of negligence did the plaintiff make here? The plaintiff has alleged that the defendant was negligent in one or more of the following ways. Number one, the tables were placed on the shelf in an unsafe manner. Two, the defendant failed to secure the tables to the shelf, although they reasonably could have been so secured. Three, that the defendant failed to use a holding bracket, although that reasonably could have and should have been done. Four, in light of the surrounding circumstances, the defendant should have displayed the tables on a pallet on the floor or on the lower shelf, given the size and weight of the tables.

\* \* \*

"And to repeat, those circumstances refer to the nature, size and weight of the tables, the height they were placed at, the way the defendant claims they were originally placed, the fencing bar, the fact that customers would come in contact with items displayed, the fact that the bracket device was available for use but not used, and all the circumstances surrounding the display of tables at the store.

"You determine the standards of care, assess the circumstances surrounding the accident and decide whether the defendant corporation acted with reasonable care under those circumstances or did or failed to do what it ought to have done to ensure customer safety. That is according to the standard of reasonable care, which the defendant was obligated to exercise in ensuring customer safety. You must determine whether, given all the circumstances presented here, the way these tables were displayed presented a dangerous condition.

"But if the plaintiff proves that a dangerous condition existed, that would not suffice to establish liability under a theory of negligence as it relates to premises liability. The plaintiff must further prove that the defendant knew of such danger or that in the exercise of reasonable care should have known such danger.

"In this case, when I speak of knowledge of the dangerous condition, I am not speaking of any knowledge of the actual condition of the display here immediately before and at the time of this accident. I am referring to the defendant's knowledge of the display and the fact that customers might

Conn. App. 308; *Fuller* v. *First National Supermarkets, Inc.*, supra, 38 Conn. App. 301; *Holody* v. *First National Supermarkets, Inc.*, supra, 18 Conn. App. 556.

Furthermore, to the extent that the requested charge discussed the correct theory of negligent activity, it misstated the law thereof because it conveyed, without qualification, that the defendants would be relieved of liability for creating a dangerous display if the tables were caused to fall by "any intervening action by any third party." See footnote 8. As we explained in part I, "[a] merchandise display constructed so that an inspection by a customer, in a foreseeable and reasonable manner, causes the merchandise to fall, is a negligently constructed display." *Fleming* v. *Wal-Mart, Inc.*, supra, 268 Ark. 563–64. Thus, if the defendants displayed the tables such that expectable acts of customers would cause them to fall, the jury properly could find the defendants negligent.

Conversely, the charge given by the court accurately conveyed the law applicable to claims of negligent activity vis-à-vis the display of merchandise. The court

have contact with it at some point after it was set up and stocked. The defendant, then, had a duty of reasonable inspection of their premises to discover defective or dangerous conditions as I have just defined that term for you.

"In this case, reasonable inspection would require that the defendants make that type of inspection that a reasonably prudent corporation running a store would make under the same or similar circumstances as existed here. Keep in mind, however, that if you find the condition we have been talking about, the display of the tables, presented a danger, given all the circumstances, a party with the duty to inspect is not relieved from liability because it did not have actual knowledge of the dangerous condition.

"If by exercising reasonable care, the dangerous condition would have been discovered or have been appreciated, knowledge would be imputed to the party having the duty to inspect. But keep in mind the knowledge we are talking about, whether actual or constructive, that is imputed to: The defendant must be aware of the condition that caused the accident here, which you have determined, if you do so, presented a condition of danger after reviewing all the surrounding circumstances, including the prior experiences of Wal-Mart regarding the display."

instructed the jury to consider all of the surrounding circumstances in determining whether the tables were displayed in a dangerous manner, including the nature, size, weight and positioning of the tables, the height of the shelving, the type of restraining device used and the other available stacking options, and the defendants' knowledge that customers would handle and rearrange the merchandise. The court correctly charged that to be found negligent, the defendants need only have had knowledge that the display, under those circumstances, was dangerous, but that they need not have had knowledge of the actual condition of the display immediately before the accident.

In crafting its instructions, "the trial court must correctly adapt the law to the case in question and must provide the jury with sufficient guidance in reaching a correct verdict." (Internal quotation marks omitted.) *Sandow* v. *Eckstein*, 67 Conn. App. 243, 247, 786 A.2d 1223 (2001), cert. denied, 259 Conn. 919, 791 A.2d 566 (2002). After reviewing the entire charge, we conclude that the court accurately presented the case to the jury such that no injustice was done.

III

The defendants also claim that the court improperly granted the plaintiff's motions to set aside the jury's finding that he was negligent and for an additur. They argue in that regard that there was evidence from which the jury could have found that the plaintiff's injuries were due partially to his negligence. We disagree.

Given its assessment of the evidence presented at trial, the court had expressed reservations about charging the jury as to comparative negligence, but decided to do so anyway. It reasoned that "if the court later concluded that the charge was [appropriate] and an appellate court agreed, the matter would not have to be retried." The plaintiff excepted to the comparative

negligence charge and, thereafter, the jury returned a verdict finding him 50 percent negligent. The court subsequently granted the plaintiff's motion to set aside that finding and reinstated the original damages award.

The right to have issues of fact decided by a jury is fundamental and limits a court's legal discretion to set aside a verdict. *Weiss* v. *Bergen*, 63 Conn. App. 810, 812–13, 779 A.2d 195, cert. denied, 258 Conn. 908, 782 A.2d 1254 (2001). "Because in setting aside the verdict, the trial court deprives the party in whose favor the verdict was rendered of his constitutional right to have factual issues resolved by the jury, our role generally is to examine the evidential basis of the verdict itself to determine whether the trial court abused its discretion. . . . Accordingly, we review a decision of the trial court setting aside the verdict and ordering an additur to determine whether the trial court properly exercised its discretion." (Citation omitted; internal quotation marks omitted.) Id., 813.

At trial, the plaintiff testified as to his conversation with Main directly following the incident. He stated that he did not discuss with Main what he or Cynthia Meek were doing just prior to the tables falling. The plaintiff testified that Cynthia Meek never told him or Main that she was reaching for nearby merchandise when the tables fell. Cynthia Meek testified similarly. Conversely, Main testified that the plaintiff told him "that his wife was reaching for something on the shelf close to the tables, and that's when the tables fell." Main had recounted the conversation similarly in a written note appended to an incident report that was admitted into evidence. Denise Thompson, the store's personnel manager, testified that on the day following the incident, she spoke with Cynthia Meek prior to completing the incident report. That report states that the tables fell when the plaintiff "was pulling out 2 Coleman small camping chairs off the shelf." There was absolutely no

evidence that the plaintiff or Cynthia Meek bumped or touched the tables themselves.

"It is beyond question that the jury is the arbiter of fact and credibility." *Richmond* v. *Ebinger*, 65 Conn. App. 776, 787, 787 A.2d 552 (2001). "This court does not retry the case or evaluate the credibility of the witnesses. . . . Rather, we must defer to the [trier of fact's] assessment of the credibility of the witnesses based on its firsthand observation of their conduct, demeanor and attitude." (Internal quotation marks omitted.) *Johnson* v. *Commissioner of Correction*, 66 Conn. App. 850, 851, 785 A.2d 1225 (2001). Nonetheless, we disagree with the defendants' argument that on the basis of the relevant testimony presented, whether the plaintiff was comparatively negligent amounted to a credibility contest.

That is because even if the jury were to credit wholly the testimony of Main and Thompson and to reject fully that of the plaintiff and Cynthia Meek, that still would be insufficient to establish that the plaintiff was comparatively negligent. It cannot be said that the action of a customer in a department store in simply reaching for or removing an item from a shelf amounts to negligence. In fact, those actions are precisely what the proprietor invites and expects its customers to do. Removing merchandise from shelves is the likely act of any customer in a self-service store desiring to purchase that merchandise. Additionally, as the defendants concede in their reply brief, even if Cynthia Meek was negligent, that negligence could not be attributed to the plaintiff.

Nonetheless, the defendants argue, on the basis of the aforementioned testimony, and on the uncontested evidence that the plaintiff and Cynthia Meek were alone in the aisle at the time of the incident and could not explain how the tables were arranged prior to their falling or what had set them in motion, that the jury

reasonably could have inferred that the plaintiff did something negligent to cause the accident. We do not agree.

The Court of Appeals of Indiana rejected an argument similar to that of the defendants in *Wal-Mart Stores, Inc.* v. *Blaylock*, supra, 591 N.E.2d 625, in which the plaintiff injured his foot while trying to avoid a falling stack of trunks. There was no evidence that he had bumped or even touched the display. Id., 626. The defendant, noting that the plaintiff was alone in the area at the time of the incident and that there was no evidence that the trunks were in disarray prior to the incident or that they ever had fallen before, argued that an inference could be made that the plaintiff's negligence had caused the incident. Id. The court disagreed, "reject[ing] the contention that a lack of evidence on a proposition allows the trier of fact to draw an inference that its converse occurred"; id.; and explaining that "[a] jury can infer negligence from the facts proved, but cannot infer the existence of facts which would constitute negligence." Id. It thus rejected the defendant's claim that the evidence supported a finding of comparative negligence. We similarly reject the defendants' invitation to infer facts constituting negligence.

The defendants also argue that the plaintiff must have been negligent because "however poorly stacked, and regardless of how they got that way, the boxes would not have toppled over onto [the plaintiff] without some intervening cause that set them in motion because objects at rest tend to stay at rest." Other courts have rejected that inertia argument; see, e.g., *Mannina* v. *Wal-Mart Stores, Inc.*, 757 So. 2d 98, 104 (La. App.), writ denied, 763 So. 2d 597 (La. 2000); and we, equally, are unpersuaded. We agree with the Court of Appeal of Louisiana that "the laws of physics do not resolve the question of legal cause." Id.

A plaintiff in a personal injury action is presumed to have exercised due care, and it is the burden of a defendant who asserts the doctrine of comparative negligence to prove otherwise. General Statutes § 52-114; *Borkowski* v. *Sacheti*, 43 Conn. App. 294, 327, 682 A.2d 1095, cert. denied, 239 Conn. 945, 686 A.2d 120 (1996). We agree with the court that the defendants in this case failed to meet that burden and, accordingly, conclude that the court's granting of the plaintiff's motions for an additur and to set aside the verdict as to comparative negligence was not an abuse of discretion.

## IV

The defendants' next claim is that the jury's verdict represented an impermissible compromise and should be vacated. We are not convinced.

A court's determinations regarding whether a jury verdict resulted from improprieties are findings of fact to which we must defer unless they are clearly erroneous. *McNamee* v. *Woodbury Congregation of Jehovah's Witnesses*, 194 Conn. 645, 648, 484 A.2d 940 (1984). "[T]here is a presumption of regularity in civil proceedings including jury deliberations." (Internal quotation marks omitted.) *McNamee* v. *Woodbury Congregation of Jehovah's Witnesses*, 193 Conn. 15, 26, 475 A.2d 262 (1984), on appeal after remand, 194 Conn. 645, 484 A.2d 940 (1984). A court cannot resort to assumptions and conjecture when analyzing the basis of a jury's verdict. See *Rosenblatt* v. *Berman*, 143 Conn. 31, 37, 119 A.2d 118 (1955).

"[A] verdict which is reached only by the surrender of conscientious convictions upon one material issue by some jurors in return for a relinquishment by others of their like settled opinion upon another issue and the result is one which does not command the approval of the whole panel, is a compromise verdict founded on conduct subversive of the soundness of trial by jury."

(Internal quotation marks omitted.) *McNamee* v. *Wood-bury Congregation of Jehovah's Witnesses,* supra, 194 Conn. 647–48; *Murray* v. *Krenz,* 94 Conn. 503, 508–509, 109 A. 859 (1920).

Nonetheless, not every type of compromise made by jurors in reaching a verdict is inappropriate. "While the jury cannot go to the extent of bartering their convictions in order to reach an agreement, the law contemplates that they shall by their discussions harmonize their views if possible. Therefore, a verdict which is the result of real harmony of thought growing out of an openminded discussion between jurors with a willingness to be convinced, a proper regard for the opinions of others, a reasonable distrust of individual views not shared by their fellows, and a fair yielding of one reason to a stronger one, each juror having in mind the great desirability of unanimity both for the parties and for the public, is not open to criticism." 75B Am. Jur. 2d 549, Trial § 1786 (1992).

The defendants argue that if, as we concluded in part III, the court properly set aside the jury's finding that the plaintiff was 50 percent negligent, there is no other explanation for that finding but that the jurors bartered their convictions and settled on the "rough justice" of an impermissible compromise verdict, specifically, by "compromis[ing] [their] verdict on damages to achieve unanimity on liability." The defendants offer many broad platitudes, but no evidence in support of that assertion. Consequently, we are not convinced.

We easily can conceive of alternate reasons for the jury's verdict. This case was hotly contested as to both liability and the extent of the plaintiff's injuries. In his closing argument, the defendants' counsel depicted the plaintiff as a liar and a malingerer who was dependent on his pain medication. He emphasized the testimony of Main and Thompson, and argued that the plaintiff

or Cynthia Meek must have been negligent in removing merchandise from the nearby shelves. Combined with the court's unwarranted instruction on comparative negligence, the jury could have mistaken that testimony and counsel's skillful and zealous advocacy for evidence of the plaintiff's contributory negligence.

This is not a case in which there was testimony from a juror as to irregularities in the deliberations; see *McNamee* v. *Woodbury Congregation of Jehovah's Witnesses*, supra, 194 Conn. 646; or where the jury's award was in manifest disregard of the court's instructions. See *Rosenblatt* v. *Berman*, supra, 143 Conn. 36–37. We agree with the court that there is nothing magical about a 50 percent figure that inescapably leads to a finding of jury misconduct.

The defendants have not presented the evidence necessary to overcome the presumption of regularity in the jury's deliberations. Accordingly, we conclude that the court's finding that the jury did not return an impermissible compromise verdict was not clearly erroneous.

V

The defendants claim last that the court improperly declined to admit evidence concerning the plaintiff's gambling activities and that this was a prejudicial error necessitating a new trial. We disagree.

The following additional facts are relevant. On August 14, 2000, prior to trial, a representative of the law firm representing the defendants wrote to the plaintiff's counsel regarding the former's attempt to serve the Mashantucket Pequot Gaming Enterprise (Pequots) with a subpoena and notice of deposition. The defendants were seeking to discover information relating to the plaintiff's gambling activities at the Pequots' casino. The letter stated, in relevant part, that "[b]ecause [the Pequots] are a sovereign nation, they can not be governed by a subpoena. I was told that once they received

a copy of the subpoena, they would do their best to get the information to me. Therefore, the deposition which is scheduled for August 16th will not be going forward as noticed, and is done merely as a formality. We will certainly forward to you copies of any records that we obtain." Relying on that communication and on his personal experience with the Pequots, the plaintiff's counsel did not attempt further discovery from the casino.

On September 7, 2000, the last day of trial, the defendants' counsel attempted to introduce, through casino employee Diane Johnston, computer generated records purportedly showing the plaintiff's gambling activities at the Pequots' casino between 1993 and 2000. The defendants' purpose was to impeach the plaintiff's testimony regarding his "inability to stand or sit," and to question his assertion that as a result of his injury, he was experiencing financial hardship. The records at issue are kept for marketing purposes and contain information relating to the amounts of bets and the time spent gambling, the money that was won or lost and the particular days on which the gambling had occurred. The records are generated primarily when a casino patron inserts into a slot machine a "wampum card" containing identifying information.

Voir dire of Johnston was conducted outside of the jury's presence, and the parties presented arguments as to the admissibility of the records. The defendants argued that they were obtained properly through "informal discovery" methods that also were available to the plaintiff, and that they were admissible as business records. The plaintiff argued that he wrongly had been denied the opportunity for pretrial discovery and to conduct a deposition regarding the records.[9] The court

[9] The plaintiff also argues on appeal that the defendants' counsel exploited a connection through his law firm, which also represents the Pequots, to obtain the records. We cannot evaluate the propriety of that discovery method by addressing that argument, however, because it was not made at

thereafter excluded the records, and the defendants excepted. The court subsequently denied the defendants' motion to set aside the jury's negligence verdict, which motion was based, in part, on the exclusion of the records.

"It is a well established principle of law that the trial court may exercise its discretion with regard to evidentiary rulings, and the trial court's rulings will not be disturbed on appellate review absent abuse of that discretion. . . . In our review of these discretionary determinations, we make every reasonable presumption in favor of upholding the trial court's ruling." (Internal quotation marks omitted.) *Boretti* v. *Panacea Co.*, 67 Conn. App. 223, 227, 786 A.2d 1164 (2001), cert. denied, 259 Conn. 918, 791 A.2d 565 (2002).

"Our standard of review regarding challenges to a trial court's evidentiary rulings is that these rulings will be overturned on appeal only where there was an abuse of discretion *and a showing by the [party raising the challenge] of substantial prejudice or injustice. . . .* In reviewing claims that the trial court abused its discretion, great weight is given to the trial court's decision and every reasonable presumption is given in favor of its correctness. . . . We will reverse the trial court's ruling only if could not reasonably conclude as it did." (Emphasis added; internal quotation marks omitted.) Id.

The Connecticut Code of Evidence provides that "[a]ll relevant evidence is admissible, except as otherwise provided by the constitution of the United States, the constitution of this state, the Code or the General Statutes. Evidence that is not relevant is inadmissible." Conn. Code Evid. § 4-2; *State* v. *Trotter*, 69 Conn. App.

---

trial, and the court therefore did not consider it when ruling on the admissibility of the casino records. See *Mack* v. *LaValley*, 55 Conn. 150, 157, 738 A.2d 718, cert. denied, 251 Conn. 928, 742 A.2d 363 (1999).

1, 14–15, 793 A.2d 1172, cert. denied, 260 Conn. 932, 799 A.2d 297 (2002). At trial, the defendants established through their questioning of Johnston that the records were prepared by the casino in the normal and ordinary course of business and that they were made contemporaneously with the events that they recorded. The records, therefore, were admissible as business records. See General Statutes § 52-180; *State* v. *Downey*, 69 Conn. App. 213, 218–19, 796 A.2d 570 (2002); Conn. Code Evid. § 8-4 (a).

In ruling that the records were inadmissible, however, the court did not cite any constitutional, statutory or code of evidence provision as the basis for its ruling. The court stated only that the plaintiff did not have the opportunity to conduct discovery. The plaintiff in his appellate brief does not contend that the records were wholly irrelevant, nor does he provide any reason for the records' exclusion, other than making a vague argument that it would have been unfair to admit them under the circumstances. We agree with the defendants that the fact that the evidence was subject to different interpretations goes to its weight rather than to its admissibility. See *State* v. *Johnson*, 67 Conn. App. 299, 306, 786 A.2d 1269 (2001), cert. denied, 259 Conn. 918, 791 A.2d 566 (2002). Because we are unable to discern any established basis in law for the court's ruling disallowing the admission of the records, we conclude that the ruling was improper.

We also conclude, nonetheless, that although the court improperly declined to admit the casino records, that ruling was harmless. "[B]efore a party is entitled to a new trial because of an erroneous evidentiary ruling, he or she has the burden of demonstrating that the error was harmful. . . . The harmless error standard in a civil case is whether the improper ruling would likely affect the result." (Citation omitted; internal quotation marks omitted.) *Pagano* v. *Ippoliti*, 245 Conn.

640, 651–52, 716 A.2d 848 (1998). After our review of the records and the related testimony, we conclude that it is unlikely that their admission would have changed the outcome of the trial.

Johnston testified that some of the numbers on the records represented "theoretical wins" demonstrating potential value of the player to the casino and did not refer to a player's actual wins or losses. She stated that the information in the records was not warranted to be accurate or complete because the cards generally were used only in conjunction with certain types of gambling activities, namely, slot machines, and that wins or losses from other types of activities would escape recordation. Additionally, there was no way to know whether the person using a card was the same person to whom it had been issued. Therefore, the records were of limited value for determining the plaintiff's overall gambling losses, which were a peripheral issue in the case in any event. Furthermore, because the defendants were allowed to question the plaintiff directly regarding his gambling activities, the jury was aware of them. The plaintiff also testified that he frequently allowed his parents and in-laws to use his wampum card. We note that the jury's damages award was substantially less than that requested by the plaintiff.

Johnston also testified that slot machines could be played while the player is sitting or standing. Because the plaintiff testified that he could not sit or stand only for long periods of time, not that he could not sit or stand at all, the fact that he was able to play slot machines would have done nothing to impeach his credibility as to his injuries. Regardless, there was ample medical testimony attesting to the genuineness of those injuries.

We conclude that although the court improperly excluded the casino records, that error did not affect

the outcome of the trial and that it was, therefore, harmless. Accordingly, the court properly refused to set aside the jury's verdict of negligence on the basis of the exclusion of that evidence.

The judgment is affirmed.

In this opinion the other judges concurred.