## KAREN DIPIETRO *v.* FARMINGTON SPORTS ARENA, LLC

## KAREN DIPIETRO *v.* DIMENSIONAL TECHNOLOGY GROUP, LLC, ET AL. (AC 29175)

Bishop, Beach and Borden, Js.

Argued February 1—officially released September 14, 2010

*Ralph W. Johnson III*, with whom were *Coleman C. Duncan III* and, on the brief, *David G. Hill*, for the appellant (plaintiff).

*Christopher M. Vossler*, with whom was *Kevin M. Tighe*, for the appellees (named defendant et al.).

*Jeffrey G. Schwartz*, for the appellees (defendant Dimensional Technology Group, LLC, et al.).

*Opinion*

BORDEN, J. On March 9, 2002, Michelle DiPietro (Michelle), the minor daughter of the plaintiff, Karen DiPietro,[1] injured her ankle while playing soccer in an indoor soccer facility, namely, the Farmington Indoor Sports Arena, located in Farmington. The facility was operated by one or more of the defendants, Farmington Sports Arena, LLC (Arena), Dimensional Technology Group, LLC (Dimensional Technology), DiTommaso

---

[1] Although the complaint purports to name Michelle as a plaintiff, it is clear that the only proper plaintiff is Karen DiPietro, who brings the claim as the parent and next friend of Michelle. See *Mendillo* v. *Board of Education*, 246 Conn. 456, 460 n.3, 717 A.2d 1177 (1998); *Cottrell* v. *Connecticut Bank & Trust Co.*, 175 Conn. 257, 264, 398 A.2d 307 (1978).

Associates, LLC (Associates), and Paul DiTommaso, Jr., individually (DiTommaso).[2] The plaintiff claims that the defendants were negligent by installing and maintaining a carpet surface in the facility that was unreasonably dangerous for soccer. The principal issue of this appeal is whether the plaintiff's claim is governed, on the one hand, by the traditional rules of law applicable to so-called premises liability claims, or, on the other hand, by rules of law that require more than those traditional rules, namely, that the plaintiff establish by expert testimony a standard of care particularly applicable to indoor soccer. The trial court, *Berger, J.*, concluded that the latter was the applicable law and, accordingly, granted the defendants' motions for summary judgment. We conclude that the plaintiff's claim is governed by the rules of law applicable to premises liability claims and that, pursuant to those rules, the plaintiff's claim survives summary judgment against Arena, Dimensional Technology and DiTommaso. We also conclude that the plaintiff's claim against Associates is barred by the doctrine of res judicata. Accordingly, we reverse in part the trial court's judgment to the contrary.

The plaintiff brought the actions underlying her appeal against the defendants in two separate actions, each pursuant to General Statutes § 52-593, the so-called "wrong defendant" statute.[3] The first of these

---

[2] At one point, the plaintiff also claimed against another entity, namely, Farmington Sports, Inc. The plaintiff ultimately withdrew that claim, however.

[3] We will discuss the original action that preceded this first action that was brought pursuant to § 52-593.

General Statutes § 52-593 provides: "When a plaintiff in any civil action has failed to obtain judgment by reason of failure to name the right person as defendant therein, the plaintiff may bring a new action and the statute of limitations shall not be a bar thereto if service of process in the new action is made within one year after the termination of the original action. If service of process in the original action has been made upon an agent of the defendant named in the new action, or if the defendant in the new action is a corporation and service in the original action has been made upon an officer or agent of the corporation, notice of any claim for damage shall be

actions was filed against Arena and alleged that Arena was in control or possession of the premises where Michelle incurred her injuries. The second action was filed against Dimensional Technology, Associates, and DiTommaso. In this action, the plaintiff asserted theories of successor corporate liability, unity of interest and ownership, and piercing the corporate veils. In response to the complaint in this action, several special defenses were filed, including the statute of limitations, res judicata and collateral estoppel.

The defendants filed motions for summary judgment in both actions, claiming that, on the merits, the plaintiff's actions must fail for lack of evidence, inter alia, of the applicable standard of care and of notice to the defendants of any defect in the playing surface, as well as lack of evidence on the claims of piercing the corporate veils and on the plaintiff's theory of successor corporate liability. The defendants' summary judgment motions also reasserted their special defenses. After extensive submissions, the trial court granted the motion for summary judgment filed by Arena. The court, therefore, concluded that the claim of negligence against Dimensional Technology and DiTommaso failed on the merits for the same reasons, and that the claims of piercing the corporate veil against DiTommaso and the successor corporate liability claim against Associates "must also fail." The court did not, however, specifically address the special defenses of the statute of limitations, res judicata and collateral estoppel. The plaintiff thereafter filed this joint appeal from the judgments of the trial court.

I

Before addressing the merits of the plaintiff's appeal, we consider the alternate grounds for affirming the trial

sufficient if given in the original action, pursuant to statutory provisions, to any officer or agent of the defendant in the new action."

court's judgments; see Practice Book § 63-4 (a) (1) (A); raised by Associates, Dimensional Technology and DiTommaso, based on the special defenses filed by those defendants, and on the claimed lack of evidence supporting the plaintiff's claims of piercing the corporate veils and of successor corporate liability. Those alternate grounds arose out of the following procedural history.

In a complaint dated March 8, 2004, the plaintiff sued Associates for the injuries incurred by Michelle on March 9, 2002, at the Farmington Indoor Sports Arena, located at 21 Hyde Road in Farmington, claiming that Associates owned, controlled or possessed the soccer facility on the date of Michelle's injuries. During the course of discovery, it was determined, after the plaintiff deposed DiTommaso, that Associates could not have been the owner or possessor of the facility on that date because Associates was not in existence at that time, and that, at the time in question, the facility had been leased to Arena. Accordingly, on November 22, 2004, the trial court, *Lavine, J.*, granted Associates' unopposed motion for summary judgment.

Thereafter, in a complaint dated January 5, 2005, the plaintiff brought the first of these actions that are the subject of this appeal, against Arena, pursuant to § 52-593. The plaintiff alleged that the correct entity to be sued for Michelle's injuries was Arena, which owned, controlled or possessed the soccer facility on the date of Michelle's injuries.

In a second complaint, dated November 22, 2005, the plaintiff brought the second of these actions, also pursuant to § 52-593, against Dimensional Technology, Associates and DiTommaso. In this action, the plaintiff alleged generally that she was asserting a claim "against those entities/individuals who owned, controlled or

possessed" the facility, "against those who directed others in the manner in which they owned, controlled or possessed" the facility, "or against those who are otherwise liable for the entities/individuals that owned, controlled or possessed" the facility. More specifically, as to Associates, the plaintiff alleged that it "is the successor to the other corporate defendants," namely, Arena and Dimensional Technology, and "is essentially the same instrumentality as said defendants, [and] therefore, it is legally liable for the obligations of said defendants, including" the plaintiff's claim. As to DiTommaso, the plaintiff alleged more specifically that "the unity of interest and ownership between . . . DiTommaso and the corporate defendants . . . was such that [he] was the alter ego of said corporate defendants," that his "control of [the] said corporate defendants amounted to such complete domination of the business, its practices, policies, finances, etc. that the independence of the corporate entit[ies] ceased to exist," that as a result "the corporate veil of said defendants should be pierced as to . . . DiTommaso," and that he is therefore personally liable for the damages sustained by the plaintiff. The plaintiff did not make any specific allegations regarding Dimensional Technology. In sum, therefore, this second action is based on the general theory that, although Arena may be the corporate entity that was in control of the premises at the time of Michelle's injuries and that committed the underlying negligence, the other defendants—Associates, Dimensional Technology and DiTommaso—are nonetheless also liable based on the various theories of liability alleged against them.

## A

We first consider Associates' argument that, as an alternate ground for affirming the judgment in its favor, the doctrine of res judicata precludes the present action against it. We agree.

The doctrine of res judicata, or claim preclusion, "prevents a litigant from reasserting a claim that has already been decided on the merits. . . . Under claim preclusion analysis, a claim—that is, a cause of action—includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. . . . *Moreover, claim preclusion prevents the pursuit of any claims relating to the cause of action which were actually made or might have been made. . . . Scalzo* v. *Danbury*, 224 Conn. 124, 127–28, 617 A.2d 440 (1992); see *DeLaurentis* v. *New Haven*, 220 Conn. 225, 239, 597 A.2d 807 (1991); *Connecticut Water Co.* v. *Beausoleil*, 204 Conn. 38, 43, 526 A.2d 1329 (1987). The doctrine of res judicata [applies] . . . as to the parties and their privies in all other actions in the same or any other judicial tribunal of concurrent jurisdiction; *Wade's Dairy, Inc.* v. *Fairfield*, 181 Conn. 556, 559, 436 A.2d 24 (1980); and promotes judicial economy by preventing relitigation of issues or claims previously resolved. *Scalzo* v. *Danbury*, supra, 127; *Carothers* v. *Capozziello*, 215 Conn. 82, 94, 574 A.2d 1268 (1990)." (Emphasis added; internal quotation marks omitted.) *Commissioner of Environmental Protection* v. *Connecticut Building Wrecking Co.*, 227 Conn. 175, 188, 629 A.2d 1116 (1993).

"We have adopted a transactional test as a guide to determining whether an action involves the same claim as an earlier action so as to trigger operation of the doctrine of res judicata. [T]he claim [that is] extinguished [by the judgment in the first action] includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose. What factual grouping constitutes a transaction, and what groupings constitute a series, are to

be determined pragmatically, giving weight to such considerations as whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage. . . . *Orselet* v. *DeMatteo*, 206 Conn. 542, 545–46, 539 A.2d 95 (1988); see *Duhaime* v. *American Reserve Life Ins. Co.*, 200 Conn. 360, 364–65, 511 A.2d 333 (1986); see also *Nevada* v. *United States*, 463 U.S. 110, 130–31 n.12, 103 S. Ct. 2906, 77 L. Ed. 2d 509 (1983); 1 Restatement (Second), Judgments § 24 (1982). In applying the transactional test, we compare the complaint in the second action with the pleadings and the judgment in the earlier action." (Internal quotation marks omitted.) *Commissioner of Environmental Protection* v. *Connecticut Building Wrecking Co.*, supra, 227 Conn. 189–90. Our scope of review on this issue is plenary. *Testa* v. *Geressy*, 286 Conn. 291, 306, 943 A.2d 1075 (2008).

Application of these principles leads to the conclusion that the judgment rendered against the plaintiff and in favor of Associates in November, 2004, precludes the plaintiff's present claim against Associates. Although the claim in 2004 was based on the allegation that Associates was in possession or control of the soccer facility in question, and the present claim is based on allegations that Associates, as a successor company to Arena and as essentially the same instrumentality as Arena, is liable for the obligations of Arena, including the plaintiff's claim, the doctrine of claim preclusion nonetheless operates in this situation because the doctrine precludes, not only the same claim as previously asserted, but also any claim relating to the cause of action that might have been made. The present claim against Associates could have been made in the 2004 litigation. Simply because a different legal and factual theory is now asserted against the same

defendant based on the same transaction does not relieve the plaintiff of the constraints imposed by the claim preclusion doctrine. See *Powell* v. *Infinity Ins. Co.*, 282 Conn. 594, 608, 922 A.2d 1073 (2007); *Delahunty* v. *Massachusetts Mutual Life Ins. Co.*, 236 Conn. 582, 589, 674 A.2d 1290 (1996).

The plaintiff argues that this claim involves a transaction different from the first because the first set of allegations involved "the selection, purchase, installation and maintenance of an allegedly dangerous flooring surface," whereas the second set of allegations involves "the merger or consolidation of interests between [Associates] and the other corporate defendants." This argument is unavailing.

Under the pragmatic method of evaluating whether the first and second claims are the same for purposes of claim preclusion, these two claims are the same. Although in form the second claim involves the alleged corporate consolidation and unity of instrumentality between Arena and Associates, in substance they both involve the claim of negligence in installing and maintaining the allegedly dangerous flooring. The claimed corporate identity between Arena and Associates is only relevant because of the underlying claim of negligence. Furthermore, both claims form a convenient trial unit—indeed, it is difficult to imagine a trial against Associates that also would not involve the underlying claim of negligence—and the linkage in the second claim with the claim of negligence asserted against Arena indicates that their treatment as a unit conforms to the parties' expectations.[4]

### B

We next consider certain arguments made by Dimensional Technology and DiTommaso jointly as alternate

---

[4] Because we conclude that the plaintiff's claim against Associates is precluded by the doctrine of res judicata, it is not necessary to address the theory on which this claim relies, namely, successor corporate liability.

grounds for affirming the trial court's judgment in their favor. They first argue that § 52-593, the so-called "wrong defendant" statute, does not apply in this case because this lawsuit is "against a party against whom judgment was previously granted, plus two *additional defendants*, [namely, Dimensional Technology and DiTommaso], neither of whom had been sued at all in the past. To allow this would be an inappropriate extension of the applicable statute of limitations." (Emphasis in original.) Thus, these defendants maintain that "[i]n this case, the plaintiff never made any effort or attempt to pursue causes of action against either [Dimensional Technology or DiTommaso] prior to the running of the two year statute of limitations found in [General Statutes §] 52-584.[5] Therefore, the operation of [§ 52-593] is void ab initio, and this suit cannot be maintained against any party, particularly" Dimensional Technology and DiTommaso. This argument is without merit.

We first note that because this question is one of statutory interpretation, our scope of review is plenary. *Marandino* v. *Prometheus Pharmacy*, 294 Conn. 564, 574, 986 A.2d 1023 (2010). Furthermore, because this statute is not clear and unambiguous, we are not constrained by the plain meaning rule. *Cogan* v. *Chase Manhattan Auto Financial Corp.*, 276 Conn. 1, 7–8, 882 A.2d 597 (2005).

The argument by Dimensional Technology and DiTommaso overlooks both the language and purpose

[5] General Statutes § 52-584 provides: "No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium, shall be brought but within two years from the date when the injury is first sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed."

of § 52-593. This statute provides, in general terms, that if a plaintiff has failed to obtain judgment "by reason of failure to name the right person as defendant therein," she may, within one year of the termination of the prior action, "bring a new action *and the statute of limitations shall not be a bar thereto . . . .*" (Emphasis added.) General Statutes § 52-593. "Under Connecticut law, a right person, as that term is used in § 52-593, is one who, as a matter of *fact,* is a proper defendant for the legal theory alleged." (Emphasis in original; internal quotation marks omitted.) *Cogan* v. *Chase Manhattan Auto Financial Corp.*, supra, 276 Conn. 8. This language contemplates that, so long as the second action is brought within the one year time limitation, the defendant in that action may not avail itself of the statute of limitations. The general remedial purpose of this statute is to relieve a plaintiff of the statute of limitations consequences where the plaintiff made a factual mistake in selecting her original defendant for the legal theory of the action, so long as the plaintiff brings the second action against the "right person" within the one year period. Because the statute is remedial in nature, it should be construed broadly to accomplish its remedial purpose. See *Vincent* v. *New Haven*, 285 Conn. 778, 792, 941 A.2d 932 (2008). In addition, "any ambiguities should be resolved in a manner that furthers, rather than thwarts, the [statute's] remedial purposes." (Internal quotation marks omitted.) Id.

Under this language and purpose, the plaintiff's 2004 action, against Associates, qualifies as one in which the plaintiff failed to obtain judgment "by reason of failure to name the right person as defendant therein . . . ." General Statutes § 52-593. The plaintiff's theory of that action was negligence, based on control or possession of the soccer facility. Associates was not the factually "right person" to be sued because Associates did not exist at the time of the injury and, therefore, could not

have been in control or possession of the soccer facility; the "right person" for that theory was in fact Arena, which was the lessee of the soccer facility.

We see nothing in either the language or purpose of the statute, however, to suggest that it does not apply where, as the argument by Dimensional Technology and DiTommaso implies, the defendants in the second action were not sued in the first action or in an action brought within the applicable statute of limitations. Indeed, this argument would render the statute a virtual nullity, because it would confine its application to a case in which the defendants in the second action— namely, the presumptive "right" defendants—had already been sued in the first action or in an earlier action brought within the applicable statute of limitations—in which cases there would have been no need for the second action.

Dimensional Technology and DiTommaso also argue that § 52-593 operates to the plaintiff's advantage *only* where "the plaintiff . . . made a good faith attempt to name the proper party in the earlier action," that is, where the naming of the wrong defendant was "the product of a reasonable and honest mistake of fact as to the identity of the truly responsible individual." (Internal quotation marks omitted.) Dimensional Technology and DiTommaso argue that in this case, the "plaintiff was careless in her attempts to name a proper defendant." Thus, in their reading of § 52-593, there is an element of fault that the plaintiff must dispel, and a level of care that she must demonstrate, in order to avail herself of the statute. We disagree.

First, there is nothing in either the language or the purpose of the statute that suggests this level of inquiry. Indeed, it appears to us that in many, if not most, cases in which a plaintiff initially sues a "wrong person," there will be some level of lack of care in factual investigation

in selecting that person to be sued. The statute does not contemplate the kind of searching inquiry into the level of care taken by the plaintiff in her initial selection of a defendant that the defendants' argument would suggest. It focuses on the result of the plaintiff's decision-making process—that the plaintiff failed to sue the factually "right person"—and not on the method or quality of that process.

Second, the reliance by Dimensional Technology and DiTommaso on this court's decision in *Isidro* v. *State*, 62 Conn. App. 545, 771 A.2d 257 (2001), is misplaced. In that case, the plaintiff's original negligence action was against a state police trooper who, although the operator of the vehicle involved in the collision, was immune from liability. Id., 547. Thereafter, the plaintiff sought to sue the state on a theory of vicarious liability. This court held that § 52-593 did not save the second action from the defense of the statute of limitations because the first action had not been brought against the "wrong person" within the meaning of the statute. We held that a "mistake as to legal theory, in this instance, immunity," rather than a factual mistake in choosing the defendant did not come within the reach of § 52-593; id., 549; and, therefore, the plaintiff's original action had not failed "because she failed to name the proper defendant as a matter of fact." Id., 550. *Isidro* differs from the present case in that the plaintiff in the present case did make a factual mistake, rather than a mistake of legal theory, in suing Associates in the original action.[6]

---

[6] It is true that, in dictum, the court in *Isidro* did use language that appeared to limit the scope of § 52-593 to cases in which "the naming of the wrong defendant was the product of a reasonable and honest mistake of fact as to the identity of the truly responsible individual. See *Perzanowski* v. *New Britain*, 183 Conn. 504, 507, 440 A.2d 763 (1981); see also *Vessichio* v. *Hollenbeck*, 181 Conn. App. 515, 520, 558 A.2d 686 (1989)." *Isidro* v. *State*, supra, 62 Conn. App. 549–50. That dictum is not controlling, because it is inconsistent with the language and purpose of the statute, and neither case on which it relied, namely, *Perzanowski* and *Vessichio*, contains either the language or the reasoning reflecting such a limitation.

Dimensional Technology and DiTommaso, relying on *Cogan* v. *Chase Manhattan Auto Financial Corp.*, supra, 276 Conn. 1, also argue that the statute does not save the plaintiff's action because "the plaintiff's failure to name *all* of the defendants from whom she could have recovered in her original action does not constitute a 'failure to name the right person as defendant' within the meaning of General Statutes § 52-593." (Emphasis in original.) Id., 11. This reliance is equally misplaced. In *Cogan*, the plaintiff originally sued two defendants, the operator of a vehicle and her stepfather, under the family car doctrine, and secured a financial settlement equal to the full liability insurance coverage available under the stepfather's liability policy. Id., 3. The plaintiff in that action did not allege that the stepfather was the owner of the vehicle. Id., 9. Thereafter, having discovered that the vehicle had been leased by the stepfather, she sought to sue the defendant lessor of the vehicle. The court held that § 52-593 did not save the second action from the statute of limitations because the first action was against a factually proper defendant under the theory alleged, namely, the family car doctrine, which does not depend on ownership of the vehicle. Id., 9–10. In that context, the court stated that "the plaintiff's failure to name *all* of the defendants from whom she could have recovered in her original action does not constitute a 'failure to name the right person as defendant' within the meaning of General Statutes § 52-593." (Emphasis in original.) Id., 11. *Cogan* differs from this case because the plaintiff in this case did fail to name the factually correct defendant in the original action; her failure also to name all of the presumptively factually correct defendants whom she eventually named does not undermine that qualifying factor.

C

DiTommaso argues that the evidence at the summary judgment proceedings showed that Dimensional Technology was the owner of the property located at 21

Hyde Road in Farmington; that the company had been formed by four members of the DiTommaso family in 2001; that the soccer facility portion of the premises was leased to Arena; and that the plaintiff produced no evidence by which to pierce the corporate veil as to DiTommaso. Thus, DiTommaso contends that the judgment in his favor should be affirmed on the alternate basis of a lack of evidence to justify personal liability. Although the record does contain the uncontroverted facts referred to by DiTommaso, we conclude that the plaintiff brought forth sufficient contrary facts to escape summary judgment on the theory of piercing the corporate veil.

Our standard of review for summary judgment is well settled. "Practice Book § 17-49 provides that summary judgment shall be rendered forthwith if the pleadings, affidavits and any other proof submitted show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party. . . . The party moving for summary judgment has the burden of showing the absence of any genuine issue of material fact and that the party is, therefore, entitled to judgment as a matter of law. . . . The test is whether the party moving for summary judgment would be entitled to a directed verdict on the same facts. . . . Our review of the trial court's decision to grant the [defendant's] motion for summary judgment is plenary." (Internal quotation marks omitted.) *SS-II, LLC* v. *Bridge Street Associates*, 293 Conn. 287, 293–94, 977 A.2d 189 (2009).

"The party opposing a motion for summary judgment must present evidence that demonstrates the existence of some disputed factual issue . . . . The movant has the burden of showing the nonexistence of such issues but the evidence thus presented, if otherwise sufficient,

is not rebutted by the bald statement that an issue of fact does exist. . . . To oppose a motion for summary judgment successfully, the nonmovant must recite specific facts . . . which contradict those stated in the movant's affidavits and documents. . . . The opposing party to a motion for summary judgment must substantiate its adverse claim by showing that there is a genuine issue of material fact together with the evidence disclosing the existence of such an issue. . . . The existence of the genuine issue of material fact must be demonstrated by counteraffidavits and concrete evidence." (Internal quotation marks omitted.) *Gianetti* v. *Health Net of Connecticut, Inc.*, 116 Conn. App. 459, 464–65, 976 A.2d 23 (2009).

With respect to this issue, the plaintiff in her brief relies on the so-called identity rule for piercing the corporate veil. "When determining whether piercing the corporate veil is proper, our Supreme Court has endorsed two tests: the instrumentality test and the identity test. . . . The identity rule has been stated as follows: If a plaintiff can show that there was such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun, an adherence to the fiction of separate identity would serve only to defeat justice and equity by permitting the economic entity to escape liability arising out of an operation conducted by one corporation for the benefit of the whole enterprise. . . . The concept of piercing the corporate veil is equitable in nature and courts should pierce the corporate veil only under exceptional circumstances." (Citation omitted; internal quotation marks omitted.) *KLM Industries, Inc.* v. *Tylutki*, 75 Conn. App. 27, 32–33, 815 A.2d 688, cert. denied, 263 Conn. 916, 821 A.2d 770 (2003). There was sufficient evidence to create a question of fact on the plaintiff's claim that the corporate veil should be pierced as to DiTommaso.

The plaintiff brought forth evidence that DiTommaso was the main actor on behalf of the various corporate identities. All of the companies have the same members, namely, DiTommaso and his three siblings, each of whom has an equal number of shares, except for Associates, in which DiTommaso's parents each own 2 percent of the shares. There was evidence that the companies did not observe all corporate formalities. The various members of the companies did not hold designated corporate offices. Separate meetings were not held for the various companies; instead, one corporate meeting was held, where issues pertaining to all of the companies were discussed. No corporate minutes were kept. Furthermore, DiTommaso had ordered the flooring in question on behalf of Arena, although when he did so that corporate entity did not exist. As a member of Dimensional Technology, he gave permission to Arena to operate the soccer facility without paying any rent and without asking for rent. Finally, he permitted his father to determine which of the corporate entities would provide the security for the financing of loans taken out by Arena, although his father was not a shareholder of Arena.

In sum, we conclude that the judgment in favor of Associates should be affirmed on the alternate basis of claim preclusion. We turn, therefore, to the merits of the case, namely, the application of the proper rules of liability to apply to the plaintiff's claims against the remaining defendants, namely, Arena, Dimensional Technology and DiTommaso. We refer herein to these remaining defendants as the defendants.

II

The plaintiff claims that the trial court improperly granted the defendants' motions for summary judgment for three reasons, namely, that the court improperly (1) held that she was required to establish a particular

standard of care, (2) held that she failed to establish that the defendants breached their duty of care, and (3) disregarded the testimony and report of her expert witness.[7] Because these three reasons are intertwined with each other, we discuss them below accordingly. We agree with the plaintiff that the court improperly granted the defendants' motions for summary judgment.[8]

This case lies at the intersection of two sets of rules of law. The first set involves so-called premises liability claims, exemplified by cases such as *Baptiste* v. *Better Val-U Supermarket, Inc.*, 262 Conn. 135, 811 A.2d 687 (2002), and *Morin* v. *Bell Court Condominium Assn., Inc.*, 223 Conn. 323, 612 A.2d 1197 (1992). "It is undisputed that the plaintiff in this case was a business invitee of the defendant and that, consequently, the defendant owed the plaintiff a duty to keep its premises in a reasonably safe condition." *Baptiste* v. *Better Val-U Supermarket, Inc.*, supra, 140. "A possessor of land has a duty to an invitee to reasonably inspect and maintain the premises in order to render them reasonably safe. *Warren* v. *Stancliff*, 157 Conn. 216, 218, 251 A.2d 74 (1968). In addition, the possessor of land must warn an invitee of dangers that the invitee could not reasonably be expected to discover." *Morin* v. *Bell Court Condominium Assn., Inc.*, supra, 327. Thus, in premises liability cases, the standard of care is imposed by law and is embodied in the nature of the duty. See *Baptiste* v. *Better Val-U Supermarket, Inc.*, supra, 138 (issue of duty is question of law, and court sometimes refers to that duty as requisite standard of care). That standard of care or duty, imposed by law on those in control

[7] The plaintiff also claims that the court improperly denied her motions for reconsideration and reargument. In light of our conclusion on the merits of the plaintiff's other claims, it is not necessary to address this claim.

[8] It is not necessary to repeat here the standard applicable to our review of the granting of a motion for summary judgment and our scope of review of that action. See part I C of this opinion.

of the premises, owed to an invitee such as Michelle, includes keeping and maintaining the premises in a reasonably safe condition, reasonably inspecting the premises, and warning the invitee of dangers that the invitee could not reasonably be expected to discover.

The other set of rules of law involves situations in which the standard of care must be proven by expert testimony. This set is exemplified by cases such as *Santopietro* v. *New Haven*, 239 Conn. 207, 682 A.2d 106 (1996), and *LePage* v. *Horne*, 262 Conn. 116, 809 A.2d 505 (2002). In *Santopietro*, our Supreme Court held that expert testimony on the standard of care applicable to umpires in a softball game was required in order for a jury to decide whether they had breached an assumed duty to maintain control of the game, because "[i]f the determination of the standard of care requires knowledge that is beyond the experience of an ordinary fact finder, expert testimony [of that standard of care] will be required." *Santopietro* v. *New Haven*, supra, 226. Similarly, in *LePage* the plaintiff claimed that the defendant day care provider had negligently permitted the plaintiff's infant to sleep on her stomach, thereby causing the infant's death from sudden infant death syndrome. The court held that expert testimony was required "as to the standard of care . . . because knowledge beyond the ordinary person's purview [was] at issue." *LePage* v. *Horne*, supra, 134 n.19. Thus, in this set of cases the plaintiff must produce expert testimony on the specific, applicable standard of care and its breach.

The plaintiff contends that the first set of rules applies to her claim, namely, those rules governing premises liability, and that she met the requirements of those rules, particularly through the deposition testimony and affidavit of her expert. The defendants contend that the second set of rules applies to the plaintiff's claim, namely, that she was required to establish a specific

standard of care applicable to indoor soccer facilities, and that her expert's testimony and affidavit failed to do so. We agree with the plaintiff. We conclude that the plaintiff's claim is governed by the rules of law applicable to premises liability, and that, by virtue of her expert witness' testimony and affidavit, she brought forth sufficient admissible evidence to avoid summary judgment.

## A

In order to understand fully the arguments of the parties, it is helpful to have in mind the particular facts presented by the parties in the trial court and the court's reasoning. We therefore turn, first, to those facts and that reasoning.

Most of the facts presented by both parties are, for purposes of this appeal, undisputed. Those undisputed facts are as follows.

In November, 2001, DiTommaso, who was personally involved in maintaining the facility, selected and purchased cut pile, commercial grade carpeting on behalf of Arena for installation as the playing surface in the facility. At that time, there were at least two types of surface available for this purpose: commercial carpet of the type purchased; and a synthetic surface known as Astroturf. DiTommaso chose the carpet playing surface based on his many years of experience, including playing on similar surfaces and coaching at other indoor facilities, and based on a recommendation to him by a manufacturer's representative. A contractor was hired to install the carpet by laying it on top of the concrete floor of the facility. DiTommaso chose this surface over Astroturf because of his belief that Astroturf was very abrasive and would cause a burn if a player fell on it.

There are no written government or industry standards regarding the use of playing surfaces for indoor

soccer facilities. The major indoor soccer league in the United States used a surface similar to the carpet that was chosen by DiTommaso, and the United States Indoor Soccer Association, of which Arena was a member, had no standard prohibiting the use of such a surface. Such a surface was commonly used in indoor soccer facilities at the time. There had been no prior complaints or claims of injury at the facility or in the state based on the nature of the surface.

The Connecticut Junior Soccer Association (association) sanctions commercial indoor soccer facilities in Connecticut. In order for such a facility to gain its sanction, the facility must pass a basic site inspection. Arena was sanctioned by the association in 2001. That site inspection disclosed the surface to be lying flat and even, secured to the underlying surface, and without any visible defects.

At the time of the injury, the surface was without any holes, cuts or tears, and was flat and smooth without any debris on it. Michelle's coach, who had prior experience with indoor soccer facilities, considered the surface to be normal for such a facility.

In addition to these undisputed facts, the plaintiff brought forth the following evidence. The defendants did not perform any testing of the available surfaces to determine the relative safety of either for indoor soccer, and DiTommaso did not consider purchasing any other surface. He did not ask the carpet salesman whether one type of surface, as opposed to another, would be more safe, and did not have any conversations with anyone, including the salesman, about the safety qualities of potential surfaces. He selected the carpet surface based on his knowledge of what other soccer facilities were using, on his own personal experience, on the belief that the potential for rug burns would be less using the carpet rather than Astroturf and because a

soccer ball moves more slowly on carpeting than on Astroturf.

On March 9, 2002, Michelle was playing soccer at the facility. As she chased a ball toward the goal in an attempt to make a shot on goal, her foot stuck to the carpet surface and she fell. Although she may have come into contact with the goalie after she fell, she did not fall because of any such collision.[9] As a result of the fall, Michelle suffered a serious ankle injury.

In late 2003 or early 2004, Arena moved its soccer facility to a new facility. For the surface of that facility, DiTommaso purchased a different type of surface, namely, a synthetic "Field Turf and fill system."

The plaintiff also presented the deposition testimony, taken on February 13, 2007, and an affidavit, dated May 17, 2007, of Benno M. Nigg, professor of biomechanics and director of the human performance laboratory, faculty of kinesiology, at the University of Calgary, Canada, as an expert witness.[10] Attached to Nigg's affidavit was

___

[9] The defendants had brought forth evidence tending to show that the injury occurred because Michelle and the goalie collided while both were going for the ball and, therefore, the nature of the surface played no part in causing her injuries. There was also evidence, however, by way of Michelle's deposition, that she fell before she collided with the goalie because her foot had stuck to the surface. Therefore, there was clearly a factual issue in this regard.

[10] The plaintiff had previously, on February 13, 2007, disclosed Nigg as an expert who "is expected to testify about the dangerous nature of the flooring surface provided by the defendants and how it was not fit to be used at an indoor soccer arena." More specifically, in that disclosure the plaintiff stated: "Dr. Nigg is expected to testify in accordance with his report that is attached hereto. Specifically, he is expected to testify that the flooring surface provided by the defendants was unreasonably dangerous and unfit for use at an indoor soccer arena because (a) it produced excessive translational and rotational traction values which typically result in high injury frequencies, (b) because it showed significantly higher loading than synthetic sports surfaces found more frequently in sports arenas, and (c) because it created excessive forces on the foot which can lead to ankle injuries such as the one sustained by [Michelle], all of which was a substantial factor in causing Michelle's injuries." The disclosure added that "[t]he opinions of Dr. Nigg will be based upon his review of a number of relevant documents/

a copy of the report that, as he stated in his affidavit, he "generated as a result of the tests [he] conducted on the floor surface that existed at the indoor soccer arena." Nigg's curriculum vitae[11] runs to some forty-one pages and was presented to the trial court as another attachment to his affidavit. Nigg's affidavit, along with his accompanying report and curriculum vitae, were filed as exhibits in support of the plaintiff's memorandum of law in opposition to Arena's motion for summary judgment filed May 21, 2007.

Nigg testified[12] as follows. Using the actual shoe worn by Michelle at the time of her injury and a portion of the actual carpet surface in use at Arena at the time, as well as a portion of a more modern synthetic sports surface, and based on Michelle's description, supplied to him by her attorney, of how her foot stuck to the surface before she fell, Nigg performed a standard test to quantify what happens between a soccer shoe and the Arena surface during the movement of a player's

materials in connection with this lawsuit, upon the tests he performed of those materials, upon the epidemiological data he has previously published, and upon his education, experience and expertise in the field of biomechanics, engineering, medicine and kinesiology."

[11] Nigg's curriculum vitae consists of the following: his personal and professional history; awards and special achievements; memberships and functions in national and international research groups; memberships on professional editorial boards; refereeships for professional journal papers and grant applications; collaborations with visiting researchers and scholars; supervision of postdoctoral fellows and Ph.D students; supervision of graduate level candidates in Zurich, Switzerland, and master's level candidates in Calgary; supervision of professional assistants, summer students and research students; research grants; invited lectures, both international and national; 300 publications; six publications submitted, accepted or in press; instances of cooperation with industry; and participation in court cases as an expert witness.

[12] We use the term "testified" here to include both Nigg's deposition testimony, his affidavit, which was prepared after his deposition and presented to the trial court in connection with the summary judgment proceedings, and his written report that was attached to his affidavit. We discuss in the text the dispute over part of that affidavit, namely, paragraph 4.

foot. Nigg testified that the synthetic surface he used was a standard sports surface that has been in use a long time and is commonly used in sports facilities. The test consisted of a series of experiments measuring the resistance created between the sole of the shoe and the surface during various athletic movements of the foot, namely, forefoot rotation, midfoot rotation and lateral traction. Nigg also testified that an operator or owner of an indoor sports facility should, in the absence of government or industry standards, perform tests for the safety of the surface before installing it.

The test that Nigg performed showed that resistance levels were significantly higher on the carpeted surface than on the synthetic surface. Nigg concluded, as a result, that there was a "substantially higher risk for injuries in the carpet condition compared to [the] synthetic . . . condition." In paragraph 4 of his affidavit, Nigg opined: "The flooring surface provided by the defendants was unreasonably dangerous and unfit for use at an indoor soccer arena because (a) it produced excessive translational and rotational traction forces, which typically result in higher injury frequencies, (b) because it showed significantly higher loading than synthetic sports surfaces found more frequently in sports arenas, and (c) because it created excessive forces on the foot, which can lead to ankle injuries such as the one sustained by [Michelle]. Based on the mechanism of injury described by [Michelle], my results indicate that the surface was a substantial factor in causing [Michelle's] injury." Nigg added, in paragraph 5 of his affidavit, that "[m]y opinions are based upon my review of the documents forwarded to me in connection with this lawsuit, upon the tests my office and I performed on the floor surface that was located at the indoor soccer arena, upon the epidemiological data I have previously published, and upon my education, experience

and expertise in the field of biomechanics, engineering, medicine and kinesiology."

Nigg acknowledged that he had no knowledge of specific indoor soccer industry standards or of a specific standard of care applicable to indoor soccer facilities. He did testify, however, with regard to industry standards, that such standards generally constitute a compromise among the members of the industry that is not necessarily related to the safety of the players. He also acknowledged that he had not spoken to the plaintiff or Michelle; he did not have Michelle's deposition testimony or medical records when he issued his report; and he had no information regarding the frequency of injuries on the carpeted surface, the fit of Michelle's shoes or her soccer position.

The trial court first concluded that there is "nothing about a nondefective, carpeted floor that constitutes a dangerous condition per se." The court then stated that "[t]he question of whether the carpeted floor was safe for indoor soccer involves industry standards, engineering and mechanics," and concluded further that the question of whether the carpet in question was dangerous required expert testimony because it is beyond the ordinary knowledge and experience of jurors. The court then assumed without deciding, because the defendants had indicated that they intended to move to exclude his testimony on the basis of *State* v. *Porter*, 241 Conn. 57, 698 A.2d 739 (1997) (en banc), cert. denied, 523 U.S. 1058, 118 S. Ct. 1384, 140 L. Ed. 2d 645 (1998),[13] that Nigg was qualified to testify in the case. Nonetheless, the court stated that "only the defendants have provided evidence of the standard of care and the lack of notice about the alleged,

---

[13] We, of course, express no opinion on whether Nigg's testimony would be subject to the *Porter* standards or, if it were, whether it would comply therewith. That is an issue that will require a hearing in the trial court if the defendants file an appropriate motion therein.

dangerous defect." The court discounted Nigg's statement in paragraph 4 of his affidavit that "[t]he flooring surface provided by the defendants was unreasonably dangerous," by noting that Nigg had testified "in his deposition that he is only able to testify as to causation." In addition, the court noted that Nigg was not able to testify as to the standard of care applicable to indoor soccer facilities or as to prior notice of any defect. In addition, the court noted that "even if the plaintiff could prove the applicable standard of care and this were a case where notice is not required, the risk of the alleged affirmative act would need to be foreseeable . . . [and] not even a scintilla of evidence suggests foreseeability." (Citations omitted.)

Finally, the court determined that Nigg lacked personal knowledge of the essential facts of the case because he had not spoken with the plaintiff, Michelle, her father, who had witnessed her fall, or her coach; he had not examined Michelle's deposition or medical records when he issued his report; he had no information related to environmental conditions, the age or use of the facility, the frequencies of injury, the fit of her shoes, her soccer position, the place of injury, or what Michelle "was doing at the time of injury to gain a complete understanding of the biomechanics of the accident." Therefore, the court found "that Nigg does not have the personal knowledge about this case that would allow him to render an opinion with substantial value." This last finding appears to be a determination that, despite the court's earlier assumption, Nigg's testimony would not be admissible at trial. See *State* v. *Asherman*, 193 Conn. 695, 716–17, 478 A.2d 227 (1984), cert. denied, 470 U.S. 1050, 105 S. Ct. 1749, 84 L. Ed. 2d 814 (1985).

Accordingly, the court granted the motions for summary judgment. We read the court's opinion as resting on several independent grounds. First, expert testimony

was required to establish the standard of care applicable to an indoor soccer facility and the breach thereof, and such testimony was lacking. Second, even if expert testimony on the standard of care was not required, there was no evidence of notice of the specific defect alleged. Third, even if expert testimony on the standard of care was not required and there was no requirement of evidence of notice, there was no evidence of foreseeability. Fourth, Nigg's testimony would be inadmissible in any event because of a lack of sufficient personal knowledge of the facts of the case.

## B

With this procedural background in mind, we turn now to the merits of the appeal. In this regard, we first consider our scope of review of the question of the admissibility of Nigg's testimony in this summary judgment proceeding and, applying the appropriate scope of review, address whether that testimony should have been considered as fully admissible. The plaintiff contends that our scope of review is plenary and that Nigg's testimony should have been considered as fully admissible. The defendants contend that our scope of review is limited to whether the trial court abused its discretion and that there was no such abuse of discretion in disregarding Nigg's testimony.

Ordinarily, a trial court's ruling on the admissibility of an expert's testimony at trial is subject to the deferential scope of review of abuse of discretion. *Sullivan* v. *Metro-North Commuter Railroad Co.*, 292 Conn. 150, 157, 971 A.2d 676 (2009). That scope of review does not apply, however, where the trial court has excluded such testimony in connection with a summary judgment proceeding.

It is well settled that our scope of review of a trial court's determination on a motion for summary judgment is plenary. *SS-II, LLC* v. *Bridge Street Associates,*

supra, 293 Conn. 294. Where, as here, the trial court ruled the expert's testimony inadmissible in the course of summary judgment proceedings, it would be inconsistent with that plenary scope of review to subject a particular subset of the trial court's determinations in those proceedings, namely, the admissibility of an expert's opinion, to the highly deferential abuse of discretion scope of appellate review.

Furthermore, it would be inconsistent with the well settled principles of summary judgment jurisprudence that the burden is on the movant to establish that there is no genuine issue of material fact involved in the case, and that the facts must be viewed in the light most favorable to the nonmoving party, to subject the court's ruling on the admissibility of Nigg's opinion to an abuse of discretion scope of review. The abuse of discretion standard for appellate review assumes that the trial court had discretion and therefore could have reasonably ruled either way; to apply a deferential scope of review to its ruling, where as here it excluded the expert's testimony, would be inconsistent with the movant's burden to establish that there is no genuine issue of fact, and with the notion that the facts are to be viewed in the light most favorable to the nonmoving party. Put another way, because the movant in a summary judgment proceeding has the burden to show that there is no genuine issue of fact and the facts are to be viewed in the light most favorable to the nonmoving party, a trial court in such a proceeding would be obligated to exercise its discretion in favor of the nonmoving party's offer of evidence. Similarly, in applying our plenary scope of review to the question of the admissibility of Nigg's testimony, the same considerations compel us to resolve any doubts about that question in favor of admissibility.

The defendants' reliance on *Sherman* v. *Bristol Hospital, Inc.*, 79 Conn. App. 78, 84, 882 A.2d 1254 (2003),

is misplaced. In that medical malpractice case, the trial court held a two day evidentiary hearing in response to the defendants' motion in limine to preclude the testimony of the plaintiff's proposed expert because the parties agreed "that a favorable ruling on that motion would be determinative of whether the plaintiff could maintain his action"; id., 82; and on the basis of that evidentiary hearing the court ruled the testimony inadmissible in part. Id. Thereafter, the court granted the motion for summary judgment because, based on the prior ruling, the plaintiff would be unable to prove his case. Id., 83. In the ensuing appeal, we applied the highly deferential abuse of discretion scope of review to the trial court's evidentiary ruling. Id., 84. That case is distinguishable because the ruling in the trial court was akin to a ruling at trial, made on a full factual record, and not made during the course of a summary judgment proceeding.[14]

Applying our plenary scope of review, therefore, to the plaintiff's offer of Nigg's testimony, we conclude

---

[14] We acknowledge that the federal rule is to apply an abuse of discretion standard to the question of the admissibility of expert opinion in the summary judgment context. See, e.g., *General Electric Co.* v. *Joiner*, 522 U.S. 136, 142–43, 118 S. Ct. 512, 139 L. Ed. 2d 508 (1997). We think, however, that for the reasons we have given it is more consistent with our summary judgment jurisprudence to apply a de novo standard of review, particularly when the trial court has excluded the expert opinion.

We are also aware of this court's opinion in *Turner* v. *Croman*, 52 Conn. App. 445, 448–49, 726 A.2d 1168 (1999), in which the court, after reciting the traditional rule of the admissibility of expert opinion testimony, including the trial court's discretion in such rulings, stated that "[w]e agree with the conclusion of the trial court that the attorney affiant qualified as an expert witness." Id., 449. *Turner* is not controlling, however. The court did not focus its analysis on the question of the scope of appellate review of the trial court's ruling. Instead, the court focused its analysis on whether the witness had qualified as an expert witness. See id., 448–49. *Turner* should not be read, therefore, as holding that when a trial court excludes an expert witness' testimony in the course of a summary judgment proceeding, the scope of appellate review of that ruling is limited to whether the trial court abused its discretion.

that it should have been fully considered. "The general standard for admissibility of expert testimony in Connecticut is simply that the expert must demonstrate a special skill or knowledge, beyond the ken of the average juror, that, as properly applied, would be helpful to the determination of an ultimate issue. . . . Once the threshold question of usefulness to the jury has been satisfied, any questions regarding the expert's qualifications properly go to the weight, and not to the admissibility, of his testimony." *Davis* v. *Margolis*, 215 Conn. 408, 416–17, 576 A.2d 489 (1990). "The underlying principle is that if any reasonable qualifications can be established, the objection goes to the weight rather than the admissibility of the [expert's opinion] evidence." (Internal quotation marks omitted.) *Sanderson* v. *Bob's Coaster Corp.*, 133 Conn. 677, 682, 54 A.2d 270 (1946). In addition, Practice Book § 17-46 "sets forth three requirements necessary to permit the consideration of material contained in affidavits submitted in a summary judgment proceeding. The material must: (1) be based on personal knowledge; (2) constitute facts that would be admissible at trial; and (3) affirmatively show that the affiant is competent to testify to the matters stated in the affidavit. The requirements that the affidavit be based on personal knowledge and contain facts admissible at trial do not mean, however, that expert opinions in the form of affidavits may not be considered in a summary judgment proceeding. For the purposes of an expert's opinion, the expert's personal knowledge of facts is comprised of those materials on the basis of which he properly may render his opinion. See *State* v. *Kemp*, 199 Conn. 473, 476, 507 A.2d 1387 (1986). These materials include those on the basis of which the expert forms an opinion, and include . . . hearsay . . . . See *State* v. *Cosgrove*, 181 Conn. 562, 584, 436 A.2d 33 (1980). Furthermore, an expert's opinion is, for purposes of § [17-46], a fact that would be admissible

at trial, assuming that the expert is qualified to render such an opinion." (Internal quotation marks omitted.) *Barrett* v. *Danbury Hospital*, 232 Conn. 242, 251–52, 654 A.2d 748 (1995). Thus, an expert's opinion may be based on secondhand sources, such as his training and experience, and information obtained from others. See id.; *State* v. *Pjura*, 68 Conn. App. 119, 127, 789 A.2d 1124 (2002); *Eisenbach* v. *Downey*, 45 Conn. App. 165, 179, 694 A.2d 1376, cert. denied, 241 Conn. 926, 696 A.2d 1264 (1997); C. Tait, Connecticut Evidence (3d Ed. 2001) § 7.9.3, p. 534. Although an expert's opinion must be based on facts, "there is no rule of law declaring the precise facts which must be proved before [his] opinion may be received in evidence." (Internal quotation marks omitted.) *State* v. *John*, 210 Conn. 652, 677, 557 A.2d 93, cert. denied, 493 U.S. 824, 110 S. Ct. 84, 107 L. Ed. 2d 50 (1989).

Our code of evidence incorporates these standards. Section 7-4 (a) provides that an expert may give an opinion "provided sufficient facts are shown as the foundation for the expert's opinion." Conn. Code Evid. § 7–4 (a). Section 7-4 (b) provides that those facts "may be those perceived by or made known to the expert at or before the proceeding. The facts need not be admissible in evidence if of a type customarily relied on by experts in the particular field in forming opinions on the subject . . . ." Conn. Code Evid. § 7–4 (b).

Under these standards, Nigg's entire testimony, including his opinion that the carpet was unreasonably dangerous for an indoor soccer facility and was a substantial factor in causing Michelle's fall, was admissible for purposes of the summary judgment proceeding. His curriculum vitae dispels any reasonable doubt about his general qualifications as an expert in the field of biomechanics and related fields, and the defendants do not seriously question those qualifications. His personal knowledge, namely, of how Michelle was injured,

related to him by her counsel as described by her and her father, who witnessed the injury, and of the experiments that he and his colleagues conducted, about which he testified in detail, using the specific shoes she had been wearing at the time of the injury and the actual carpet from the defendants' facility, was sufficient for his opinion to be admissible. Also supporting the admissibility of Nigg's testimony was his comparison of the carpeted surface used by the defendants to the synthetic sports facility surface that he also used in his experiments, and the evidence that, subsequent to Michelle's injury, the defendants installed, in a different facility, a different, synthetic sports facility surface. "The plaintiff in all negligence cases may show that better, safer and more practicable devices than those used were available to the defendant." (Internal quotation marks omitted.) *Delmore* v. *Polinsky*, 132 Conn. 28, 31, 42 A.2d 349 (1945).

Thus, with regard to Nigg's personal knowledge, the defendants' arguments in support of the trial court's decision are unavailing. The facts that Nigg had not spoken to Michelle, her father or her coach, that he did not have her deposition or medical records when he issued his report, that he did not know of the environmental conditions at the time of the injury, or of the facility's age or its use, that he had no information regarding the frequency of injuries, or regarding the fit of her shoes, or her soccer position, all go to the weight, not the admissibility, of his testimony. Considering the range of Nigg's personal knowledge of the facts that he did have, we disagree with the trial court and the defendants that the absence of Nigg's personal familiarity with these facts rendered his opinion without substantial value. See *Shelnitz* v. *Greenberg*, 200 Conn. 58, 67, 509 A.2d 1023 (1986) ("doctor may give an [expert] opinion . . . without having examined or treated the patient" [internal quotation marks omitted]).

The decision in *Porter* v. *Thrane*, 98 Conn. App. 336, 908 A.2d 1137 (2006), on which the defendants rely, is not to the contrary. In that case, this court held that the opinion of a residential real estate appraiser, who presented an updated appraisal report, had been improperly admitted into evidence because the appraiser "did not have the essential facts necessary to form an opinion about the value of the property." Id., 340. There, however, unlike the present case, the appraiser had not inspected the property, and no one from his office had done so since the original appraisal two years before; he never viewed the house or cottage on the property, even from a distance; and he was unfamiliar with the interior of the house on the property. On that record, this court concluded that his testimony was "based on speculation and lack of personal knowledge." Id., 341. Nigg's personal knowledge, as we have outlined previously, is not in the speculative category as determined in *Porter* v. *Thrane*, supra, 336.

With regard to the trial court's disregard of paragraph 4 of Nigg's affidavit, the defendants offer two contentions. First, they contend that, as the trial court determined, the statements he made in that paragraph were inconsistent with his deposition testimony and, therefore, were properly disregarded. Second, they contend, as an alternate ground for affirmation of the trial court's disregard of Nigg's affidavit, that we should adopt the federal "sham affidavit" rule, pursuant to which a court, under some circumstances, disregards "an offsetting affidavit that is submitted in opposition to a motion for summary judgment when the affidavit contradicts the affiant's prior sworn deposition testimony." (Internal quotation marks omitted.) *In re CitX Corp., Inc.*, 448 F.3d 672, 679 (3d Cir. 2006). "[A sham affidavit is an] affidavit that contradicts clear testimony previously given by the same witness, [usually] used in an attempt to create an issue of fact in response to a motion for

summary judgment." (Internal quotation marks omitted.) Id. We are not persuaded.

To the extent that the trial court disregarded Nigg's affidavit because it was merely inconsistent with his deposition testimony, we conclude that that is an insufficient reason for a trial court to disregard it entirely. The usual legal remedy for inconsistent statements by a witness is for the adversary to point them out for purposes of impeaching the witness' credibility; such an inconsistency is not ordinarily a ground for precluding the witness' testimony entirely. We see no reason for a different rule to prevail in a summary judgment proceeding, particularly given the fact that in such a proceeding the evidence is to be viewed in a light most favorable to the nonmoving party. We turn, therefore, to the defendants' contention that we should employ the "sham affidavit" rule so as to preclude Nigg's affidavit in the present case.

The defendants argue that we should employ the sham affidavit rule to bar consideration of Nigg's affidavit—particularly paragraph 4 thereof—because in "his affidavit, Nigg states that '[t]he flooring surface provided by the defendants was unreasonably dangerous'; yet he testifies in his deposition that he is only able to testify as to causation. Indeed, he attests that he has no position on standard of care or breach of duty." We need not decide in this case whether to adopt the sham affidavit rule because even if we were to do so, it would not suffice to bar Nigg's affidavit.

One of the corollaries of the sham affidavit rule is that an affidavit that supplements or amplifies prior deposition testimony, rather than contradicting it, does not violate the sham affidavit rule. *Langman Fabrics* v. *Graff Californiawear, Inc.*, 160 F.3d 106, 112 (2d Cir. 1998) (material issue of fact may be revealed by subsequent sworn testimony that amplifies or explains,

rather than contradicts, prior testimony, "especially where the party was not asked sufficiently precise questions to elicit the amplification or explanation" [internal quotation marks omitted]); *Galvin* v. *Eli Lilly & Co.*, 488 F.3d 1026, 1030 (D.C. Cir. 2007) (affidavit that does not contradict but instead clarifies prior sworn testimony admissible). In his deposition, Nigg testified that, based on his tests, there was a substantially higher risk for injuries in the carpet condition compared to the synthetic condition. In paragraph 4 of his affidavit, Nigg opined: "The flooring surface provided by the defendants was unreasonably dangerous and unfit for use at an indoor soccer arena . . . ." A careful examination of Nigg's deposition testimony does not disclose, however, the type of conflict between deposition testimony and subsequent affidavit material to which the sham affidavit rule applies.

The only deposition testimony that the defendants refer us to in support of their contention is testimony in which Nigg was asked repeatedly whether he had any information or opinion on the standard of care specifically applicable to indoor soccer facilities, such as whether there were any government or industry standards governing such facilities, whether he was familiar with the United States Indoor Soccer Association and any floor surfaces that that association might have recommended, and whether he had ever been the manager or administrator of a youth indoor soccer program. Our scrutiny of this testimony, however, discloses that it was wholly consistent with the plaintiff's claim in this case, namely, that the defendants maintained an unreasonably dangerous flooring surface for an indoor soccer facility, on the basis of premises liability, irrespective of any special standard of care applicable to such facilities. Thus, Nigg's affidavit, particularly paragraph 4 thereof, was merely supplemental to and an amplification of, and not contradictory to, his deposition testimony.

Accordingly, even if we assume, without deciding, that the sham affidavit rule were to apply in Connecticut, it would not operate properly to bar Nigg's affidavit in the present case.

## C

Having concluded that Nigg's testimony should have been considered by the trial court in full, we turn, now, to the principal basis of the trial court's decision, namely, that in the present case in order for the plaintiff to prevail she would have to produce expert testimony of the specific standard of care applicable to indoor soccer facilities and of the breach of that standard of care. We agree with the plaintiff, however, that her claim rests on the rules of law applicable to premises liability in which the law itself imposes the standard of care, namely, the duty to provide and to maintain premises in a reasonably safe condition. We conclude further that Nigg's affidavit was sufficient for the plaintiff to survive the defendants' motions for summary judgment in this regard.

First, it must be remembered that the plaintiff's claim by its terms rests on the nature of the premises, namely, the unsafe condition of the carpeted surface for purposes of indoor soccer. It does not rest on the nature of any particular actor's specialized conduct. Thus, in this respect, the claim differs from both *Santopietro* v. *New Haven,* supra, 239 Conn. 207, and *LePage* v. *Horne,* supra, 262 Conn. 116, on which the defendants rely. In both of those cases the focus of liability was on the specialized conduct of the defendant actors: in *Santopietro,* the softball umpires and in *LePage,* the day care provider.

Second, it is salient in the present case that there are, all parties agree, no governmental standards governing the type of floor surface for indoor soccer facilities. This necessarily means that, if the operator installs

and maintains a surface that is customarily used for such facilities; and if that surface is in fact dangerous, in the sense of being unreasonably unsafe, for the users of such a facility, as Nigg asserts based on his expertise; and if that danger has not yet manifested itself by prior accidents known to or discoverable by the parties, as is the case here; then the first person to suffer from such an initial manifestation, such as Michelle, would be without a remedy; whereas perhaps the second, third or fourth person to suffer thereby would have a remedy because the danger would have sufficiently manifested itself to justify such a recovery. We think that the law should permit the first person injured by the danger to recover, rather than waiting until more persons are so injured. Put another way, the law should compensate, and not penalize, the first person to bring the unsafe condition to light. Furthermore, to the extent that there are no industry standards governing such facilities, such standards or their absence would not be determinative in any event because such standards are merely evidentiary and not conclusive of a duty of care. *Considine* v. *Waterbury*, 279 Conn. 830, 864–65, 905 A.2d 70 (2006).

On the basis of the standard applicable to premises liability, Nigg's testimony was sufficient to withstand the defendants' motions for summary judgment. His opinion that the defendants' surface was unreasonably dangerous for use as an indoor soccer facility is precisely the type of expert opinion in premises liability cases that our courts have long countenanced and deemed sufficient to prove negligence. See, e.g., *Delmore* v. *Polinsky*, supra, 132 Conn. 30 ("There was definite expert testimony that the arrangement of the steps was unsafe. This is sufficient to support a finding of negligence."). In addition, there was evidence on which the jury could have found that there were other surfaces that were more safe than that employed by the defendants. Such evidence is grist for the jury mill

on the question of negligence in a premises liability case. See, e.g., id., 31. Furthermore, there was no need for the plaintiff to prove notice of the unsafe condition because the defendants were responsible for creating the unsafe condition. *Kelly* v. *Stop & Shop, Inc.*, 281 Conn. 768, 777, 918 A.2d 249 (2007); *Meek* v. *Wal-Mart Stores, Inc.*, 72 Conn. App. 467, 474, 806 A.2d 546, cert. denied, 262 Conn. 912, 810 A.2d 278 (2002); *Tuite* v. *Stop & Shop Cos.*, 45 Conn. App. 305, 308–309, 696 A.2d 363 (1997). Similarly, on the factual question of foreseeability, ordinarily, if a defendant was responsible for creating the unsafe condition, it is quintessentially a jury question as to whether he could foresee that harm of the general nature of that suffered was likely to result. See *Miranti* v. *Brookside Shopping Center, Inc.*, 159 Conn. 24, 30, 266 A.2d 370 (1969); *Gutierrez* v. *Thorne*, 13 Conn. App. 493, 500–501, 537 A.2d 527 (1988). Given the evidence that the defendants installed and maintained an unsafe surface in their facility, a jury could reasonably find that injury to an athlete who played on the surface was foreseeable.

We emphasize, of course, that we are not deciding whether Nigg's testimony must be believed. That will be a matter for the trier of fact at trial. We decide only that it should have been considered in full in these summary judgment proceedings and that, if believed, it, taken together with all of the other evidence supplied by the plaintiff, was sufficient for the plaintiff to withstand the defendants' motions for summary judgment.

The judgment is affirmed as to DiTommaso Associates, LLC. The judgments are reversed as to Farmington Sports Arena, LLC, Dimensional Technology Group, LLC, and Paul DiTommaso, Jr., and the case is remanded with direction to deny their motions for summary judgment and for further proceedings according to law.

In this opinion BEACH, J., concurred.

BISHOP, J., concurring. Although I agree with part I of the majority's opinion and its conclusion that the trial court improperly rendered summary judgment in favor of the defendants Farmington Sports Arena, LLC, Dimensional Technology Group, LLC, and Paul DiTommaso, Jr.,[1] I write separately because I believe that, in part II of its opinion, the majority misinterprets the basis of the court's decision and, in suggesting that a trial court's evidentiary rulings in connection with a summary judgment procedure are inevitably subject to a plenary standard of review, the majority invites deviation from our well established decisional law.

In response to the defendants' motions for summary judgment, the court determined that the plaintiff, Karen DiPietro, failed to establish the presence of a genuine issue of material fact sufficient to reach a jury on the basis that her expert, Benno M. Nigg, would not be able to offer evidence concerning the applicable standard of care and would not be able to testify that the defendants had prior notice of any alleged defect in the soccer playing surface. In addressing the plaintiff's claim on appeal concerning this issue, the majority characterizes the court's decision as a ruling on the admissibility of Nigg's testimony. In granting the defendants' motions for summary judgment, however, the court explicitly stated that it was assuming, for purposes of ruling on the motions, that Nigg's conclusions were valid and persuasive. The court found, nevertheless, that Nigg's testimony was insufficient because he was not going to be able to testify concerning the standard of care or notice of the alleged defect, and the plaintiff had presented no other evidence in that regard. In other words, in this part of its decision, the court determined

---

[1] Although the court also granted the motion for summary judgment filed by DiTommaso Associates, LLC, for the purposes of this concurrence we refer to only Farmington Sports Arena, LLC, Dimensional Technology, LLC, and Paul DiTommaso, Jr., as the defendants.

that Nigg's testimony was legally inadequate, not inadmissible. Indeed, the court determined that the plaintiff could not satisfy her burden of proof to sustain a negligence action even with Nigg's testimony. Because the court explicitly credited Nigg's testimony, I do not think that it can fairly be read as excluding it in regard to the issues of notice and the standard of care.

In rendering summary judgment in favor of the defendants, the court also appears to have determined that Nigg's testimony would be inadmissible at trial due to his lack of personal knowledge regarding the circumstances of the incident giving rise to the alleged injuries to the plaintiff's minor daughter, Michelle DiPietro (Michelle). My difficulty with the majority's response to this aspect of the court's ruling is the majority's suggestion that our review of any determination of admissibility by a trial court in a summary judgment context should be plenary. In making this assertion, I believe the majority overstates its point as applied to the procedural facts of this case, and, in the process, unnecessarily casts doubt on our bedrock jurisprudence that a trial court's evidentiary rulings are, generally, subject to the more deferential standard of review for an abuse of discretion no matter the context in which they are made. See *Turner* v. *Croman*, 52 Conn. App. 445, 726 A.2d 1168 (1999). In short, not every ruling on the admissibility of evidence made by a trial court in conjunction with a summary judgment hearing is subject to plenary review. Furthermore, this case presents no reason for this court to stray from our well established jurisprudence that a trial court's evidentiary rulings, to the extent it is proper for the court to have made evidentiary rulings, are subject to a more deferential abuse of discretion standard despite the context in which they arise.

Here, it is not the court's ruling that Nigg's testimony would be inadmissible because of his lack of personal

knowledge that we review, but, rather, we assess the correctness of the court's making such an evidentiary ruling in the face of conflicting evidence regarding Nigg's personal knowledge of the circumstances of Michelle's accident. "In deciding a motion for summary judgment, the trial court must view the evidence in the light most favorable to the nonmoving party." (Internal quotation marks omitted.) *Sherman* v. *Bristol Hospital, Inc.*, 79 Conn. App. 78, 87, 882 A.2d 1254 (2003). Because the court must, when deciding a motion for summary judgment, accept all facts alleged by the nonmoving party as true, it would be inappropriate to engage in weighing the evidence or the testimony submitted. *Roy* v. *Bachmann*, 121 Conn. App. 220, 223, 994 A.2d 676 (2010) (trial court does not sit as trier of fact when ruling on motion for summary judgment). Thus, when there is a factual issue in dispute, the court should not resolve that issue on summary judgment, but, rather, that issue must be left to the fact finder for resolution.

In the case at hand, contrary to the defendants' assertions and the trial court's finding, Nigg's affidavit could reasonably support the conclusion that he received personal information from Michelle's family as to the circumstances of the accident. Rather than crediting this evidence as it was required to do, the trial court, instead, decided a material fact in concluding that Nigg had insufficient personal knowledge to permit him to testify. In doing so, the court improperly resolved a factual dispute rather than confining itself to whether such a dispute exists so as to survive the summary judgment motions. Consequently, I believe that we should accord plenary review to the court's determination that Nigg is not competent to testify, not on the basis that the court's evidentiary ruling should be accorded plenary review, but, rather, because the court was legally incorrect in engaging in such an assessment when the evidence was in conflict. Because the court acted beyond

its scope of authority in this manner, its ruling is legally incorrect. Thus, although I agree with the majority that we should accord plenary review to the trial court's determinations in this summary judgment matter, I cannot share the majority's broad assertion that any review of a trial court's admissibility rulings in a summary judgment matter should be plenary simply because they arise in a summary judgment context. Accordingly, I concur with the outcome reached by the majority but not with its analysis in all respects.